93 P.3d 1145

**In the Interest of DOE CHILDREN:**

**John, Born on January 27, 1987,**

**and**

**Jane, Born on July 31, 1988, minors.**

**No. 24697.**

Supreme Court of Hawai'i.

June 16, 2004.

Reconsideration Denied July 27, 2004.

Jay K. Goss, Deputy Attorney General (DAG) and Mary Anne Magnier, DAG, for the appellant Department of Education, State of Hawai'i.

Kimberly S. Towler, Appellee–Guardian Ad Litem.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

The appellant Department of Education (DOE) appeals from the following orders of the family court of the first circuit, the Honorable John C. Bryant, Jr. presiding: (1) the September 10, 2001 minute order, ordering the Department of Education (DOE) to place John Doe (John) in the eighth grade; and (2) the October 16, 2001 orders concerning the Child Protective Act, denying the motion of the DOE and the Department of Human Services (DHS), filed on October 1, 2001, for reconsideration of the September 10, 2001 minute order.[1]

The DOE asserts the following on appeal: (1) that the family court erred in finding that it had the authority to enter orders that violated the Individuals with Disabilities Education Act (IDEA), 20 United States Code (U.S.C.) §§ 1400–1487 (2001)[2] and the *Felix* consent decree;[3] (2) that the family court

---

1. Although the DHS was one of the parties in the family court and joined the DOE in filing a notice of appeal on November 14, 2001, the DHS did not file, neither jointly nor individually, any briefs with this court.

2. 20 U.S.C. § 1400(d) provides:
 The purposes of this chapter are—
 (1)(A) to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living;
 (B) to ensure that the rights of children with disabilities and parents of such children are protected; and
 (C) to assist States, localities, educational service agencies, and Federal agencies to provide for the education of all children with disabilities;
 (2) to assist States in the implementation of a statewide, comprehensive, coordinated, multidisciplinary, interagency system of early intervention services for infants and toddlers with disabilities and their families;
 (3) to ensure that educators and parents have the necessary tools to improve educational results for children with disabilities by supporting systemic-change activities; coordinated research and personnel preparation; coordinated technical assistance, dissemination, and support; and technology development and media services; and
 (4) to assess, and ensure the effectiveness of, efforts to educate children with disabilities.

3. See *Jennifer Felix et al. v. Benjamin Cayetano, et al.*, Civil No. 93–00367 DAE (D.Haw. Oct. 25, 1994) (Order Granting Approval of Consent Decree). In *Felix*, the United States District Court for the District of Hawai'i "acknowledge[d] that

erred in finding that it had subject matter jurisdiction to decide the educational placements of children; (3) that, assuming *arguendo* that the family court did have jurisdiction to review the decisions of the DOE regarding grade placement of children, the family court erred in reviewing John's grade placement in accordance with the "best interest of the child standard," as opposed to the "contrary to law" or "abuse of discretion" standard; and (4) that the issues raised in the present matter are not moot simply because the DOE followed the family court's order and placed John in the eighth grade, inasmuch as (a) the family court could order that John remain in the eighth grade indefinitely and (b) the issue of the family court's subject matter jurisdiction is capable of repetition but, if moot, would evade appellate review.

John's Guardian Ad Litem (GAL) responds as follows: (1) that the family court is authorized by Hawaii Revised Statutes (HRS) chapters 571 [4] and 587 [5] to order the DOE to

---

the State of Hawai'i ... violated the IDEA by failing to provide required services to children with disabilities." *In re Doe Children: Jane, Born on September 2, 1983; and John, Born on May 12, 1983*, 96 Hawai'i 272, 275, 30 P.3d 878, 881 (2001) [hereinafter, *"In re Doe Children"*].

The *Felix* plaintiff class includes "all children and adolescents with disabilities residing in Hawaii ... who are eligible for and in need of education and mental health services [pursuant to the IDEA] but for whom [such services] are either unavailable, inadequate, or inappropriate...." *Felix* Consent Decree at 4. One purpose of the consent decree is "to ensure that the [p]laintiff [c]lass has available to them the free appropriate public · education they are entitled to under the [IDEA]." *Id.* at 1. The decree references a May 24, 1994 order by the United States District Court for the District of Hawai'i [ruling] that the State has "systematically failed to provide required and necessary educational and mental health services to qualified handicapped children of the State of Hawai'i in violation of the [IDEA]." *Id.* at 3–4. *Id.* at 272 n. 3, 30 P.3d at 881 n. 3.

4. HRS § 571–1 (1993) requires that HRS chapter 571, regarding "Family Courts,"
 shall be *liberally construed* to the end that children ... whose rights and well-being are jeopardized shall be assisted and protected, and secured in those rights through action by the [family] court; that the [family] court may formulate a plan adapted to the requirements of the child and the child's family and the necessary protection of the community, and may utilize all state and community resources to the extent possible in its implementation. (Emphasis added.)
 HRS § 571–3 (1993) provides that "[i]n any case in which it has jurisdiction the [family] court shall exercise general equity powers as authorized by law." HRS § 571–8.5(a)(10) (Supp.2000) provides in relevant part that "[t]he district family judges may ... [m]ake and award judgments, decrees, orders, and mandates, issue executions and other processes, and do other acts and take other steps as may be necessary to carry into full effect the powers that are or shall be given to them by law or for promotion of justice in matters pending before them...."

HRS § 571–11 (1993) provides in relevant part:
 **Jurisdiction; children.** Except as otherwise provided in this chapter, *the [family] court shall have exclusive original jurisdiction in proceedings:*
 ....
 (2) Concerning any child living or found within the circuit:
 (A) Who is neglected as to or *deprived of educational services because of the failure of any person or agency to exercise that degree of care for which it is legally responsible[.]*
 ....
 (9) *For the protection of any child under [HRS] chapter 587.*
 (Emphases added.)

5. HRS § 587–1 (Supp.2000) provides in relevant part:

 This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm. Furthermore, this chapter makes provisions for the service, treatment, and permanent plans for these children and their families.
 ....
 *This chapter shall be liberally construed to serve the best interests of the children and the purposes set out in this chapter.*
 (Emphasis added.)
 HRS § 587–2 (1993) provides in relevant part:
 "Family home" means the home of the child's legal custodian where there is the provision of care for the child's physical and psychological health and welfare.
 ....
 "Permanent custody" means the legal status created under this chapter by order of the court after the court has considered the criteria set forth in section 587–73(a) or (e) and determined by clear and convincing evidence that it is in the best interests of the child to order a permanent plan concerning the child.
 (1) Permanent custody divests from each legal custodian and family member who has been summoned pursuant to section 587–32(a),

place John in the eighth grade, because, among other things, in the GAL's view, the statutory scheme expressly confers that authority; (2) that administrative review was unavailable and the individualized education program (IEP) [6] process was stalemated, effectively denying John his right to due process of law, augmenting the need for the family court to address the problem; and (3) that once the DOE decided not to move John from the eighth to the ninth grade, the conflict became moot.

and *vests in a permanent custodian, each of the parental and custodial duties and rights of a legal custodian and family member, including, but not limited to, the following:*
....
.(B) To assure that the child is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities;
(C) *To monitor the provision to the child of appropriate education;*
(D) *To provide all consents that are required for the child's physical or psychological health or welfare, including,* but not limited to, medical, dental, psychiatric, psychological, *educational,* employment, recreational, or social *needs;* and to provide all consents for any other medical or psychological care or treatment....

(Emphases added.) Effective June 24, 1998, July 1, 1999, and July 1, 2001, respectively, the legislature amended HRS § 587-2 in respects not pertinent to the present matter. *See* 1998 Haw. Sess. L. Act 134, § 3, at 505–06; 1999 Haw. Sess. L. Act 153, § 1, at 491–92; 2001 Haw. Sess. L. Act 51, § 1, at 80–81.

HRS § 587-11 (1993) provides:

**Jurisdiction.** *Pursuant to [section] 571–11(9), the court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred,* are discovered, or are reported to the department, which facts and circumstances constitute the basis for the finding that the child is a child whose physical or psychological health or welfare is subject to imminent harm, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

(Emphasis added.)

HRS § 587-27 (1993) provides in relevant part that the DHS, as John's permanent custodian, must file a permanent written plan that includes *"[t]he objectives concerning the child, including,* but not limited to, stable placement, *education,* health, therapy, counseling, birth family (including visitation, if any), culture, and adoption, guardianship, or preparation for independent living[.]"* (Emphases added.)

HRS § 587-73(b)(4) (Supp.2000) empowers the family court, in cases in which the Child Protective Act applies and permanent custody of the child is awarded to the State, to issue *"such further orders as the court deems to be in the best interests of the child...."* (Emphasis added.)

**6.** 20 U.S.C. § 1401(11) provides that "[t]he term 'individualized education program' or 'IEP' means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with section 1414(d) of this title."

20 U.S.C. § 1414(d)(1)(A) provides in relevant part that the IEP includes
(iii) a statement of the special education and related services and supplementary aids and services to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—
(I) to advance appropriately toward attaining the annual goals;
(II) to be involved and progress in the general curriculum ... and to participate in extracurricular and other nonacademic activities; and
(III) to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph;
(iv) an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in clause (iii); [and]
....
(vii)(I) beginning at age 14, and updated annually, a statement of the transition service needs of the child under the applicable components of the child's IEP that focuses on the child's courses of study (such as participation in advanced-placement courses or a vocational education program)....
20 U.S.C. § 1414(d)(4)(A) provides in relevant part:
(4) Review and revision of IEP
(A) In general
The local educational agency shall ensure that, subject to subparagraph (B), the IEP Team—
(i) reviews the child's IEP periodically, but not less than annually[,] to determine whether the annual goals for the child are being achieved; and
(ii) revises the IEP as appropriate to address—
(I) any lack of expected progress toward the annual goals and in the general curriculum, where appropriate;
(II) the results of any reevaluation conducted under this section;
(III) information about the child provided to, or by, the parents, as described in subsection (c)(1)(B) of this section;
(IV) the child's anticipated needs; or
(V) other matters.

For the reasons discussed *infra* in section III, we hold: (1) that GALs do not have standing to pursue an IDEA claim and cannot avail themselves of the "futility exception" to the requirement of administrative exhaustion; (2) that the district family courts may not exercise judicial review of administrative proceedings conducted pursuant to the IDEA; and (3) that the district family courts lack subject matter jurisdiction, under any circumstances, to order the DOE to alter a child's grade placement. Accordingly, we reverse the family court's September 10, 2001 and October 16, 2001 orders.

## I. *BACKGROUND*

### A. *Statutory and Regulatory Background of the IDEA*

Pursuant to HRS § 302A–1102 (Supp. 2003),[7] the DOE is responsible for the administration of the IDEA pursuant to a federal-state statutory and regulatory regime. For present purposes, inasmuch as this court previously discussed the statutory and regulatory background underlying the IDEA in *In re Doe Children: Jane, Born on September 2, 1983; and John, Born on May 12, 1983,* 96 Hawai'i 272, 30 P.3d 878 (2001) [hereinafter, *"In re Doe Children "*], we reiterate the following:

> The IDEA has a complex statutory and regulatory framework, the basic purpose of which is to ensure that states provide an appropriate education to children with disabilities. The IDEA was originally enacted in 1970 as the Education of the Handicapped Act, Pub.L. No. 91–230, §§ 601, 611, 84 Stat. 175, 178 (1970), substantially revised in 1975, *see* Pub.L. No. 94–142, 89 Stat. 773–96 (1975), and given its present name in 1990. Pub.L. No. 101–476, § 901(a), 104 Stat. 1141, 1142 (1990). As a condition of receiving federal funds for the special educational needs of disabled children, states are required to maintain policies and procedures that ensure all dis-

abled children receive a free appropriate public education (FAPE). *See* 20 U.S.C. § 1412(a)(1); *see also Honig v. Doe,* 484 U.S. 305, 310 [108 S.Ct. 592, 98 L.Ed.2d 686] . . . (1988). A FAPE is defined as

> special education and related services that—
>
> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary, or secondary school education in the State involved; and
>
> (D) are provided in conformity with [an] individualized education program [defined in 20 U.S.C. § 1414(d) ].

20 U.S.C. § 1401(8). . . . "Special education" refers to

> specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including—
>
> (A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and
>
> (B) instruction in physical education.

20 U.S.C. § 1401(25). . . . "Related services" means

> transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, psychological services, physical and occupational therapy, recreation, including therapeutic recreation, social work services, counseling services, including rehabilitation counseling, orientation and mobility services, and medical services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a child with a disability to benefit from special education, and includes the early identification and as-

---

7. HRS § 302A–1102 provides in relevant part:
 **Department of education; statewide and regional administrative services.** The department shall serve as the central support system responsible for the *overall administration of statewide educational policy, interpretation, and*

*development of standards for compliance with state and federal laws,* and coordination and preparation of a systemwide budget for the public schools. . . .
(Emphasis added.)

sessment of disabling conditions in children.

20 U.S.C. § 1401(22).... Thus, as a condition of receiving federal funds, the State of Hawai'i is required to provide not only special education, but also related services, such as the psychological or mental health services at issue here, as part of the FAPE to which children with disabilities are entitled.

The primary state agency in Hawai'i responsible for ensuring that disabled children receive a FAPE is DOE. *See* 20 U.S.C. § 1412(a)(11);[8] HRS § 26–12 (Supp.2000) (DOE responsible for administration of education and public instruction)....

. . . .

... According to the IDEA, states must provide for the opportunity to evaluate complaints regarding the provision of a FAPE, *see* 20 U.S.C. §§ 1415(a) and 1415(b)(6),[9] and the opportunity must include the possibility of conducting an "impartial due process hearing" provided for

according to state law or regulations. *See* 20 U.S.C. § 1415(f)(1).[10]

Parents have the right to seek judicial review of any final administrative decision by bringing a civil action "in any State court of competent jurisdiction or in a district court of the United States[.]" 20 U.S.C. § 1415(i)(2)(A).[11] Therefore, federal law requires states to provide a process that allows parents, who feel compelled to place their children in a private school because of the state's failure to meet its obligation to provide a FAPE, to seek reimbursement for the cost of doing so. . . .

*Id.* at 276–78, 30 P.3d at 882–84 (emphases omitted).

*In re Doe Children* also noted as follows:

Hawai'i has established the required review process for complaints related to FAPE through a statutory and regulatory scheme. HRS § 302A–443(a) (Supp.2000) provides in part that:

> *An impartial hearing may be requested by any parent or guardian of a handicapped child, or by [DOE], on any*

**8.** 20 U.S.C. § 1412(a)(11) provides in relevant part:

**State educational agency responsible for general supervision**
(A) **In general**
The State educational agency is responsible for ensuring that—
(i) the requirements of this subchapter are met; and
(ii) all educational programs for children with disabilities in the State, including all such programs administered by any other State or local agency—
(I) are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and
(II) meet the educational standards of the State educational agency.

**9.** 20 U.S.C. § 1415(a) provides:

**Establishment of procedures**
Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education by such agencies. Moreover, 20 U.S.C. § 1415(b) states in relevant part:

The procedures required by this section shall include—
. . . .
(6) an opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child[.]

**10.** 20 U.S.C. § 1415(f)(1) provides in relevant part:

Whenever a complaint has been received under subsection (b)(6) ... of this section, the parents involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

**11.** 20 U.S.C. § 1415(i)(2)(A) provides:

Any party aggrieved by the findings and decision made under subsection (f) ... and any party aggrieved by the findings and decision under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States without regard to the amount in controversy.

*matter relating to the identification, evaluation, program, or placement of a handicapped child.* [DOE] shall adopt rules that conform to the requirements of any applicable federal statutes or regulations pertaining to the impartial hearing based on the education of a handicapped child.

*Pursuant to the statute, Title 8 of the Hawaii Administrative Rules (HAR) allows for a hearing to assess complaints regarding the provision of a FAPE.*

*Id.* at 287, 30 P.3d at 893 (emphases added). More specifically, HAR § 8–56–72(a) provides that "[a] parent or the [DOE] may initiate a hearing on any of the matters described in section 8–56–68(a)[ 12] (relating to the identification, evaluation or *educational placement of a student with a disability, or the provision of a free appropriate public education to the student* )." (Emphasis added.) HAR § 8–56–2 defines the term "parent" as follows:

(1) A natural or adoptive parent of a student;

(2) A guardian but not the State if the student is a ward of the State;

(Emphasis added.)

12. HAR § 8–56–68(a) provides:

*Prior notice by the department; content of notice.* (a) Written notice that meets the requirements of subsection (c) shall be given to the parent of a student with a disability a reasonable time before the department:
(1) Proposes to initiate or change the identification, evaluation, or educational placement of the student or the provision of a free appropriate public education to the student; or
(2) *Refuses to initiate or change the* identification, evaluation, or *educational placement of the student or the provision of a free appropriate public education to the student.*
(Emphases added.)

13. HAR § 8–56–2 is based upon 34 Code of Federal Regulations (C.F.R.) § 300.20, which provides as follows:

Parent.
(a) General. As used in this part, the term parent means—
(1) A natural or adoptive parent of a child;
(2) A guardian but not the State if the child is a ward of the State;
(3) A person acting in the place of a parent (such as a grandparent or stepparent with whom the child lives, or a person who is

(3) A person acting in the place of a parent (such as a grandparent or stepparent with whom the student lives, or a person who is legally responsible for the student's welfare); or

(4) *A surrogate parent who has been appointed in accordance with section 8–56–80.*

(5) A foster parent may act as a parent under this chapter if the natural parents' authority to make educational decisions on the student's behalf has been extinguished under state law 8–56–2 and it is not otherwise contrary to the relevant court order; and the foster parent:

(A) Has a long-term parental relationship with the student;

(B) Is willing to make the educational decisions required of parents under this chapter; and

(C) Has no interest that would conflict with the interests of the student.[ 13]

(Emphasis added.) HAR § 8–56–80 requires that the DOE "shall ensure that the rights of a student are protected *when . . . [t]he student is a ward of the State under the laws of the State . . . [by] assign[ing] . . . an individual to act as a surrogate parent.*" [14]

legally responsible for the child's welfare); or
(4) A surrogate parent who has been appointed in accordance with § 300.515.
(b) Foster parent. Unless State law prohibits a foster parent from acting as a parent, a State may allow a foster parent to act as a parent under Part B of the Act if—
(1) The natural parents' authority to make educational decisions on the child's behalf has been extinguished under State law; and
(2) The foster parent—
(i) Has an ongoing, long-term parental relationship with the child;
(ii) Is willing to make the educational decisions required of parents under the Act; and
(iii) Has no interest that would conflict with the interests of the child.

14. HAR § 8–56–80 also provides in relevant part:

(c) The department shall ensure that a person selected as a surrogate:
(1) Is not an employee of the department, or any other agency that is involved in the education or care of the student, except that an individual who is an employee of a private agency that only provides non-educational care for the student and who meets the standards in this subsection may be selected;

Parties may seek judicial review of the outcome of the administrative hearing as follows:

> HAR § 8–56–78, like the federal law, provides that *"any party" aggrieved by the results of the due process hearing may bring a civil action "in any state court of competent jurisdiction" or in federal district court.* Thus, Hawai'i law provides for the administrative review process mandated by federal law.... *Exhaustion of this administrative process is mandatory prior to seeking judicial review. See Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 93, 734 P.2d 161, 169 (1987) (*"Judicial review of agency action will not be available unless the party affected has taken advantage of all the corrective procedures provided for in the administrative process."* (Citations and internal quotation marks omitted.)); *see also Honig v. Doe,* 484 U.S. 305, 326–27 [108 S.Ct. 592, 98 L.Ed.2d 686] ... (1988) (noting the IDEA's exhaustion requirement).

*In re Doe Children,* 96 Hawai'i at 287, 30 P.3d at 893 (emphases added).

### B. Factual Background

#### 1. Custody and IEP

On March 10, 2000, the DHS filed a petition for foster custody of John and Jane Doe in the family court of the first circuit.[15] On March 16, 2000, the family court appointed the GAL to represent John and Jane, and, on April 2, 2001, the family court awarded permanent custody of the children to the DHS.[16] As the permanent custodian, DHS agreed to be responsible for "[p]rovid[ing] all consents that [would be] required for [John, Jane, and their half sibling's] physical, medical, dental, *educational,* recreational[,] and social needs." (Emphasis added.)

(2) Has no interest that conflicts with the interest of the student the surrogate parent represents; and
(3) Has knowledge and skills that ensure adequate representation of the student.
(d) An individual who otherwise qualifies to be a surrogate parent under subsection (c) is not an employee of the agency solely because the individual is paid by the agency to serve as a surrogate parent.
(e) The surrogate parent may represent the student in all matters relating to:
(1) The identification, evaluation, and educational placement of the student; and
(2) The provision of a free appropriate public education to the student.

HAR § 8–56–80 is based upon 34 C.F.R. § 300.515, which provides as follows:

Surrogate parents.
(a) General. Each public agency shall ensure that the rights of a child are protected if—
(1) No parent (as defined in § 300.20) can be identified;
(2) The public agency, after reasonable efforts, cannot discover the whereabouts of a parent; or
(3) The child is a ward of the State under the laws of that State.
(b) Duty of public agency. The duty of a public agency under paragraph (a) of this section includes the assignment of an individual to act as a surrogate for the parents. This must include a method—
(1) For determining whether a child needs a surrogate parent; and
(2) For assigning a surrogate parent to the child.
(c) Criteria for selection of surrogates.
(1) The public agency may select a surrogate parent in any way permitted under State law.
(2) Except as provided in paragraph (c)(3) of this section, public agencies shall ensure that a person selected as a surrogate—
(i) Is not an employee of the SEA, the LEA, or any other agency that is involved in the education or care of the child;
(ii) Has no interest that conflicts with the interest of the child he or she represents; and
(iii) Has knowledge and skills that ensure adequate representation of the child.
(3) A public agency may select as a surrogate a person who is an employee of a nonpublic agency that only provides non-educational care for the child and who meets the standards in paragraphs (c)(2)(ii) and (iii) of this section.
(d) Non-employee requirement; compensation. A person who otherwise qualifies to be a surrogate parent under paragraph (c) of this section is not an employee of the agency solely because he or she is paid by the agency to serve as a surrogate parent.
(e) Responsibilities. The surrogate parent may represent the child in all matters relating to—
(1) The identification, evaluation, and educational placement of the child; and
(2) The provision of FAPE to the child.

**15.** The DHS filed its petition pursuant to HRS §§ 571–11(9), *see supra* note 4, and 587–11, *see supra* note 5.

**16.** Jane Doe's status is not implicated in the present matter.

John was a special education student and a member of the *Felix* class of students receiving educational services pursuant to the IDEA. *See supra notes* 2 and 3. During the 2000–01 school year, John attended eighth grade at Wai'anae Intermediate School. At the end of the school year, John had earned 6.0 credits, enough to continue on to ninth grade. In July 2001, however, John was placed with new foster parents, who sought to enroll him to repeat the eighth grade at Kahuku Intermediate School.

On August 16 and 24, 2001, John's IEP "team" [17] met to determine what grade placement (*i.e.*, eighth or ninth grade) would be appropriate for him, but the team could not reach a consensus. Although the Department of Health (DOH) home and school-based therapist, John's foster parents, John's DHS social worker, the GAL, John's Wai'anae Adolescent Day Treatment Program (ADTP) teacher, the ADTP Program Director, John's Wai'anae Intermediate counselor, and John himself all advocated an eighth grade placement, Kahuku administrative and teaching personnel, as well as John's surrogate parent and DOH administrative personnel, asserted that John should be placed in the ninth grade. The GAL and John's foster father wrote letters of dissent in hopes of convening an administrative hearing on the issue of John's grade placement. In the meantime, Kahuku administrative personnel placed John in their ADTP, where John began classes on August 27, 2001, without knowing his final grade placement.

On August 29, 2001, Kahuku's principal, Lisa DeLong, informed the GAL that she had the ultimate authority regarding John's grade placement. Moreover, Principal DeLong stated that, to the best of her knowledge, the GAL and the "new" foster parents (having been foster parents for less than six months) had no "clout" in IEP determinations; instead, John's surrogate parent was the only individual who could have requested an administrative hearing.

On August 31, 2001, because John's surrogate parent favored promoting John to the ninth grade, the GAL filed a motion in the family court to afford the DOE independent legal representation. In conjunction with her motion, the GAL declared that "[t]here is no avenue for administrative or other review available to [John] or those who know him. It is in [John's] best interests that [the family court] determine his educational placement[.]"

### 2. Hearing on the GAL's motion to afford the DOE independent legal representation

On September 5, 2001, a hearing on the GAL's motion was conducted before the Honorable John C. Bryant. The family court noted that both John and his foster parents favored placement in the eighth grade. Although the GAL further asserted that the DHS social worker also believed that John should be placed in the eighth grade,[18] the deputy attorney general (DAG)—who was representing the DHS and the DOE simultaneously at the time—advised the family court that the DHS, as an agency, would support whatever the IEP team concluded, such that the DHS social worker's personal opinion did not represent the agency's position. The DAG also noted that, as of the date of the hearing, John's IEP had not been finalized, such that his grade placement was not yet certain.

In response to the family court's question regarding whether it had "the authority to order [the] DOE to place [John] in eighth grade," the GAL opined as follows:

> As to the determination of the Court's authority, I would suggest that in this case . . . the court has a special relationship to [John], by virtue of him being a ward of this state.
>
> . . . .
>
> In addition, Your Honor, I would suggest that in this case there is no adminis-

---

17. John's IEP team included, *inter alia*, the vice principal of Kahuku Intermediate and High Schools, his surrogate parent, the GAL, the school psychologist, and John's foster parents.

18. The transcript reflects that, notwithstanding the DHS social worker's recommendation during the IEP conferences that John be placed in the eighth grade, she testified at the hearing that she believed John "should be with other ninth graders[,] . . . students who are at his age level."

trative avenue open to [John] because his surrogate parent has [only] met him twice. . . .

. . . .

. . . There's a definition for parent in [Code of Federal Regulations (C.F.R.)] Section 300.20 . . . [, *see supra* note 13]. It defines who can exercise a child's right to . . . [request a hearing].

One is the natural or adoptive parent, we don't have that.

Two is the guardian, which is what [the DHS social worker] is, but not the State, so she's out.

Three is a person acting in place of the parent, such as grandparent or stepparent with whom the child lives or a person who's legally responsible for the child's welfare.

Four is a surrogate parent.

The definition of foster [parent] says, [u]nless state law prohibits a foster parent from acting as a parent, the State may allow a foster parent to act as a parent under part B of the act if the natural parents' authority to make educational decisions on the child's behalf has been extinguished by state law, which it has.

The foster parent has an ongoing, long-term parental relationship with the child. [John] has been with [his new foster parents] for six to eight weeks, so I don't know if [the foster parents] would be eligible under that[;] [the foster parents are] willing to make educational decisions, and [they] ha[ve] no interest of the child.

The only person . . . who can make the administrative appeal is a surrogate parent, and she won't. Therefore, I think we're in a position where if we pursued [an] administrative remedy, we wouldn't get anywhere. If I filed or [John's foster parents filed], we will eventually get a decision that says dismissed, no standing.

Therefore, I think it falls upon the family court to make the determination that's in [John]'s best interest.

The DHS social worker noted that the IEP was "just pending," but stated that "she need[ed] to make a decision[,] . . . [a]nd at that point, . . . [John would have been placed] in the ninth grade because he [had been] promoted [from the eighth grade]." The social worker reiterated that she "could make [her decision] at any time, but [her] decision would be to promote him"; the DAG also confirmed that "[t]he IEP actual formal document ha[d]n't been prepared, but the IEP [would place John in the ninth grade.]" The family court therefore decided that it "[did]n't need to wait for the IEP[,]" and took the matter under advisement. Prior to adjournment, however, the family court stated that, "if [the family court] feel[s that it] ha[s] the authority, [it is] going to order [the DOE] to put [John] in [the] eighth grade" because the family court believed that "it's in his best interest."

3. *Minute order, first motion for reconsideration, family court orders, and notice of appeal*

On September 10, 2001, the family court issued a minute order, ruling as follows:

The Court finds that it has inherent authority in this case, under Chapters 571 and 587, [*see supra* notes 4 and 5,] to order the Department of Education to place [John] in the 8th grade. The testimony is essentially uncontroverted that such an order is in [John]'s best interest, and the burden on the [DOE] is nil. . . .

The [DOE] is therefore ordered to place [John] in the 8th grade. . . .

On October 1, 2001, the DOE and the DHS, both represented by the same DAG, jointly filed a motion for reconsideration of the September 10, 2001 minute order requiring the DOE to place John in the eighth grade [hereinafter, "October 1, 2001 motion for reconsideration"] and requested a hearing on the matter. In the motion, the DOE and DHS referred the family court to this court's decision in *In re Doe Children*, which had been issued on August 30, 2001. 96 Hawai'i 272, 30 P.3d 878. The DOE and DHS also argued in their memorandum in support that, as the GAL herself acknowledged at the September 5, 2001 hearing, "the GAL . . . ha[d] no standing pursuant to HRS § 302A–443[, *see supra* section I.A,] to raise the issue of grade-level placement of the child." The DOE and DHS noted that "[i]n

this case, other than the DOE, the person with standing to pursue the administrative process in this case, the surrogate parent, . . . 'voted' in favor of 9th grade placement at the IEP . . . and has not pursued the administrative process."

In addition to the foregoing, the affidavit of Janke Ahuna, who was the DHS's Leeward Child Welfare Service Section Administrator, was made a part of the record and averred that "it is the position of the [DHS] to adopt the recommendations of the [IEP] in matters relating to educational services to be provided to children[.]" Ahuna also asserted that "where a majority agreement cannot be reached pertaining to the recommendations of the IEP, the protocol is for the principal of the school to cast the deciding vote. In cases where the principal's vote is necessary, the DHS supports the recommendation of the principal because it is then the IEP recommendation[.]"

On October 11, 2001, the family court conducted a hearing on the DOE's and DHS's October 1, 2001 motion for reconsideration. At the hearing, the family court discussed' the applicability of this court's decision in *In re Doe Children*, *see supra* section I.A, to the present matter and heard arguments from both parties on the issue of the family court's subject matter jurisdiction. The family court took the question of its subject matter jurisdiction under advisement and continued the hearing to October 16, 2001 in order to evaluate the evidence regarding what grade placement would be in John's best interest. On the same day, the family court issued a written order continuing the hearing on the DOE's and DHS's motion for reconsideration to October 16, 2001 and denominating the DOE as a party for purposes of determining the limited issue of grade placement.[19]

On October 16, 2001, the hearing on the DOE's and DHS's motion for reconsideration resumed before the family court. The family court stated that the DAG representing the DOE and DHS had informed the family court that the DOE had decided "to keep [John] in [the] eighth grade." "[A]s a result

of that decision," the family court asserted "that [there] was no issue that needed to be determined [at the hearing.]" Nevertheless, the DAG argued as follows:

[DAG]: . . . I would ask . . . that the Court grant our motion . . . for reconsideration, . . . although we had no remedy that we're asking for today, we are going to keep him in the eighth grade because we don't want him to be confused about where . . . he is, and I believe the consensus was to not be moved around.

We . . . are not conceding that our original decision was inappropriate, and . . . we stand by our arguments in the motion.

The family court responded as follows:

. . . [T]he Court finds that there is no triable issue remaining . . . on this particular issue. The Court is finding that the motion for reconsideration is [moot].

The Court finds that there is no reason to have a best interest hearing in terms of educational grade level decisions, so I'm not going to allow a best [interest] hearing on that issue as well.

The family court found that the GAL's motion to afford the DOE independent legal representation was also moot, because it was dismissing the DOE as a party in light of John's final grade placement.

On the same date, October 16, 2001, the family court issued orders concerning the Child Protective Act, *see supra* note 5, specifically finding and ordering as follows:

A. DOE complied with the minute order issued on September 10, 2001 from the September 5, 2001 hearing, ordering the child to be placed in the 8th grade;

B. Now that he is considered an 8th grader, DOE believes it would not be in the child's best interests to change him back to the 9th grade if the Court grants its motion for reconsideration;

C. The Motion for Reconsideration is moot;

D. There is no triable issue remaining.

*infra.*

---

19. Although issued on October 11, 2001, the orders were not filed until October 17, 2001. *See*

THEREFORE, IT IS HEREBY ORDERED THAT:

1. The Motion for Reconsideration of the September 10, 2001 Minute Order Requiring the [DOE] to Place [John] in the 8th Grade and Request for Hearing is denied as moot and therefore[ ] the Court will take no action on it;

2. There is also no reason to have an evidentiary hearing on the issue of the grade placement that is in the minor's best interests;

3. DOE shall be dismissed as a party to this case;

4. GAL's Motion to Make DOE a party with Independent Representation[,] filed on August 31, 2001[,] is denied as moot[;]

5. All prior consistent orders shall remain in full force and effect until further order of the Court.

On November 14, 2001, the DOE filed a notice of appeal from (1) the September 10, 2001 minute order requiring that John be placed in the eighth grade and (2) the October 16, 2001 orders concerning the Child Protective Act, which denied the DOE's and DHS's October 1, 2001 motion for reconsideration. This court docketed the November 14, 2001 appeal as appeal No. 24697.

On December 6, 2001, the family court entered written orders concerning the Child Protective Act regarding John, specifically concluding that "[t]he [family court] has inherent authority in this case, under [HRS] Chapters 571 and 587, to order the [DOE] to place [John] in the 8th grade" and requiring that the DOE do so.

■ On December 18, 2001, the GAL filed a notice of cross-appeal from (1) the October 17, 2001 orders concerning the Child Protective Act, which reflected the family court's earlier preliminary rulings regarding the DOE's and DHS's October 1, 2001 motion for reconsideration, *see supra* note 19, and (2) the October 16, 2001 orders concerning the Child Protective Act, which denied the

DOE's and DHS's October 1, 2001 motion for reconsideration.[20]

4. *Second motion for reconsideration, family court orders, and second notice of appeal*

On December 24, 2001, the DOE and DHS filed a motion for reconsideration [hereinafter, the "December 24, 2001 motion for reconsideration"] of the December 6, 2001 orders concerning the Child Protective Act regarding John, which had ordered the DOE to place John in the eighth grade. The DOE and DHS filed the motion, which was substantively identical to their October 1, 2001 motion for reconsideration, "because the first order was only a minute order which ha[d] since been reduced to a written order, which procedurally may [have] need[ed] to [have] be[en] reconsidered for purposes of the appeal which [had been] filed [on November 14, 2001.]"

On January 14, 2001, the family court entered findings of fact (FOFs) and conclusions of law (COLs) with respect to its December 6, 2001 order requiring the DOE to place John in the eighth grade. The family court's COLs provided in relevant part:

1. The Court has inherent authority in this case under [HRS] Chapters 571 and 587 to order the [DOE] to place [John] in the 8th Grade, as follows.

2. Pursuant to H.R.S. Section 571–1, [*see supra* note 4,] . . . [C]hapter 571 is to be liberally construed to the end that children and families whose rights and well-being are jeopardized shall be assisted and protected, and secured in those rights through action by the court; the court may formulate a plan adapted to requirements of the child and the child's family and the necessary protection of the community, and may utilize all state and community resources to the extent possible in its implementation.

---

**20.** The GAL did not file a separate opening brief regarding her cross-appeal, as required by Hawaii Rules of Appellate Procedure (HRAP) Rule 28(h) ("If there is a cross appeal, separate opening and answering briefs on the cross appeal, and any reply brief relating thereto, *shall be filed* in addition to the briefs on the primary appeal. . . ." (Emphasis added.)). Thus, we deem the GAL's cross-appeal to be waived.

3. Under H.R.S. Section 571–3, [*see supra* note 4,] family courts exercise general equity powers as authorized by law.

4. Under H.R.S. Section 571–8.5(a)(10), [*see supra* note 4,] the district family judges may make and award judgments, decrees, orders and mandates, issue executions and other processes, and do other acts and take other steps as may be necessary to carry into full effect the powers that are or shall be given to them by law or for the promotion of justice in matters pending before them.

5. Pursuant to H.R.S. Section 571–11(9), [*see supra* note 4,] the Court has exclusive original jurisdiction in this child protective proceeding.

6. ... [HRS] Chapter 587 is to be liberally construed to serve the best interests of the children and the purposes set out ... therein.

7. As [John]'s permanent custodian, under the H.R.S. Section 587–2 definition of "permanent custody," DHS is required among other things ... "to monitor the provision to the child of appropriate education."

8. [HRS] Section 587–2, [*see supra* note 5,] the definition of "permanent custody," in relevant part, states, "... (1) Permanent custody divests from each legal custodian and family member ..., and vests in a permanent custodian, each of the parental and custodial duties and rights of a legal custodian and family member, including, but not limited to, the following: ... (D) To provide all consents that are required for the child's physical or psychological health or welfare, including ... educational ... needs...."

9. [John]'s permanent plan is required by H.R.S. Section 587–27[, *see supra* note 5,] to include the objectives including ... education ... and the methods for achieving [that] objective[ ].

10. Under H.R.S. Section 587–73(b)(4), [*see supra* note 5,] once the court determines permanent custody should be awarded, the Family Court has the authority and is required to enter such further orders as the court deems to be in the best interest of the child.

11. The [DOE] is charged with providing an appropriate education, and the [DHS] is charged with providing adequate protection from harm caused by the family, and, as permanent custodian, to provide for all the child's needs. The Family Court is charged with preventing harm to [John] by ensuring that his custodian act in his best interest and by issuing appropriate orders.

12. Also, as stated in [*In re Doe Children, see supra* section I.A,] John's status as a "ward of the state" creates an independent state basis for jurisdiction that obligates the State to monitor the provision to him of appropriate education and provide all consents that are required for [John]'s health and welfare, including ... educational ... needs. (*See* H.R.S. Section 587–2, definition of "permanent custody.") This independent state basis for jurisdiction exists regardless of whether he is entitled to such relief pursuant to the [IDEA, *see supra* note 2]...."

13. Also as stated in [*In re Doe Children*], DHS, as [John]'s permanent custodian, is obligated to provide for [John]'s special educational needs and his mental health needs, and DHS is the state agency legally responsible for [John]'s welfare. The Family Court [e]nsures DHS acts in his best interests.

14. Once the Family Court obtained jurisdiction under H.R.S. Chapter 587, the court's powers are very broad and encompass any of the powers available to it under H.R.S. Section 571–11(2)....

....

18. The Family Court's decision regarding the need for this 8th Grade educational placement should not be disturbed, pursuant to [*In re Doe Children*]. This Court's decision does not unnecessarily infringe upon the prerogative of executive agencies to establish and maintain programs that fulfill their respective responsibilities, and will not result in the inappropriate diversion of resources from one program when another is better suited to attend a child's needs.

19. The Family Court is fulfilling its statutorily-mandated role to prevent harm to [John] by ensuring that his custodian act in his best interest and by issuing appropriate orders.

20. It would be futile for the GAL or [John]'s foster parents to request an administrative hearing on the issue of grade placement, since neither had standing under the applicable rules and laws.

21. That no "actual controversy" existed by the October 16, 2001[ ] hearing on DOE's Motion for Reconsideration, and the Court should not be required to spend valuable time and resources deciding "abstract propositions of law or moot cases" when not capable of repetition. *In the Matter of the Application of J.T. Thomas*, 73 Haw. 223, 226, 832 P.2d 253, 254 (1992).

(Some ellipsis points added and some in original.)

On January 23, 2002, the family court entered orders concerning the Child Protective Act, which denied the DOE's and DHS's December 24, 2001 motion for reconsideration "for all the reasons previously stated." On February 13, 2002, the DOE filed a notice of appeal from (1) the December 6, 2001 orders concerning the Child Protective Act regarding John, which had ordered the DOE to place John in the eighth grade, (2) the January 14, 2002 FOFs and COLs, and (3) the January 23, 2002 orders concerning the Child Protective Act, which denied the DOE's and DHS's December 24, 2001 motion for reconsideration. This court docketed the January 23, 2002 appeal as No. 24920. On March 13, 2002, this court consolidated Nos. 24697 and 24920 under No. 24697.

## II. *STANDARDS OF REVIEW*

A. *Family Court Decisions*

■ Generally, the "family court possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion." *In re Jane Doe, Born on May 22, 1976*, 84 Hawai'i 41, 46, 928 P.2d 883, 888 (1996) (quoting *In re Jane Doe, Born on February 22, 1987*, 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994)) (internal quotation marks and citation omitted). Thus, we will not disturb the family court's decisions on appeal "unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant ... [and its] decision clearly exceed[ed] the bounds of reason." *Doe*, 84 Hawai'i at 46, 928 P.2d at 888 (quoting *Doe*, 77 Hawai'i at 115, 883 P.2d at 36) (internal quotation marks and citation omitted, brackets in original).

*In re Doe, Born on June 16, 1994*, 101 Hawai'i 220, 227, 65 P.3d 167, 174 (2003) (quoting *In re Jane Doe, Born on June 20, 1995*, 95 Hawai'i 183, 189–90, 20 P.3d 616, 622–23 (2001)).

B. *Subject Matter Jurisdiction*

■ "Whether a court possesses subject matter jurisdiction is a question of law reviewable *de novo*." *In re Doe Children*, 96 Hawai'i at 283, 30 P.3d at 889 (citing *Casumpang v. ILWU, Local 142*, 94 Hawai'i 330, 337, 13 P.3d 1235, 1242 (2000) (citations omitted)).

C. *Statutory Interpretation*

■ "[T]he interpretation of a statute ... is a question of law reviewable de novo." ... *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 ... (1995). *Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Furthermore, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. . . .

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). "Laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Rauch,* 94 Hawai'i 315, 322–23, 13 P.3d 324, 331–32 (2000) (some citations omitted).

*In re Doe, Born on June 16, 1994,* 101 Hawai'i at 227–28, 65 P.3d at 174–75 (quoting *In re Jane Doe, Born on June 20, 1995,* 95 Hawai'i at 190–91, 20 P.3d at 623–24) (some ellipsis points added and some in original).

### D. *Interpretation of Administrative Regulations*

■ With respect to interpreting the HAR,

[t]he general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

*International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citations omitted). Moreover, an administrative agency's interpretation of its own rules is entitled to "deference unless it is plainly erroneous or inconsistent with the underlying legislative purpose." *Id.*

*In re Wai'ola O Moloka'i, Inc.,* 103 Hawai'i 401, 425, 83 P.3d 664, 688 (2004) (quoting *Lee v. Elbaum,* 77 Hawai'i 446, 457, 887 P.2d 656, 667 (App.1993)).

### III. *DISCUSSION*

#### A. *Appellate Jurisdiction*

Before reaching the merits, we must address the threshold question whether this court has appellate jurisdiction to resolve the present matter.

##### 1. *Finality of underlying orders*

■ In *In re Doe Children,* this court observed that:

In general, appeals in family court cases, as in other civil cases, may be taken only from (1) a final judgment, order, or decree, *see* HRS §§ 571–54 (1993)[ 21] and 641–1(a)

21. HRS § 571–54 provides in relevant part:
**Appeal.** An interested party aggrieved by any order or decree of the court may appeal to the supreme court for review of questions of law and fact upon the same terms and conditions as in other cases in the circuit court and review shall be governed by chapter 602, except as hereinafter provided. . . .
. . . .
An order or decree entered in a proceeding based upon section 571–11(1), (2), (6), or (9) shall be subject to appeal to the supreme court only as follows:
Within twenty days from the date of the entry of any such order or decree, any party directly affected thereby may file a motion for a reconsideration of the facts involved. The

motion and any supporting affidavit shall set forth the grounds on which a reconsideration is requested and shall be sworn to by the movant or the movant's representative. The judge shall hold a hearing on the motion, affording to all parties concerned the full right of representation by counsel and presentation of relevant evidence. The findings of the judge upon the hearing of the motion and the judge's determination and disposition of the case thereafter, and any decision, judgment, order, or decree affecting the child and entered as a result of the hearing on the motion shall be set forth in writing and signed by the judge. Any party deeming oneself aggrieved by any such findings, judgment, order, or decree shall have the right to appeal therefrom to the supreme

(1993),[22] or (2) a certified interlocutory order. *See* HRS § 641–1(b) (1993).[23] ... Nevertheless, [family court] orders are appealable [even if the family court retains continuing jurisdiction if] ... they meet the "requisite degree of finality of an appealable order[.]" *In re Doe,* 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994).

The very nature of a family court chapter 587 proceeding entails "an ongoing case which does not result in a 'final' order, as that term is generally defined[,]" *Doe,* 77 Hawai'i at 114, 883 P.2d at 35 (citing *In re N.D.,* 857 S.W.2d 835, 842 (Mo.Ct.App. 1993)), because, under chapter 587, the family court retains continuing jurisdiction over the case in order to prevent future harm or threatened harm to a child. Thus, in such family court cases, we consider whether the particular order appealed from contains a sufficient "degree of finality" to establish appellate jurisdiction. For example, in *Doe,* we held that the requisite degree of finality existed to establish appellate jurisdiction to review a natural mother's appeal of a family court order awarding foster custody of her five-year-old child to DHS, despite the fact that the family court's continuing jurisdiction and supervision of the case was not "final." *Doe,* 77 Hawai'i at 110, 115, 883 P.2d at 31, 36. This court noted that the "manifest importance of the right of a parent to raise his or her child[,]" which we analogized to a "fundamental liberty interest[,]" weighed heavily in favor of establishing appellate

jurisdiction. *Id.* at 114–15, 883 P.2d at 35–36. Analogously, in *Cleveland v. Cleveland,* 57 Haw. 519, 559 P.2d 744 (1977), this court held that a family court decree granting divorce and dividing real property was final and appealable even though the family court retained jurisdiction to decide questions of custody and support of the couple's minor children. *Id.* at 523–24, 559 P.2d at 747–48. We noted that it would be "intolerable" for an unappealed divorce decree "to remain uncertain as to finality because the family court continues to retain jurisdiction of the proceeding to deal with the welfare of minor children[.]" *Id.* at 524, 559 P.2d at 748. We also noted that to deny appellate jurisdiction "could leave titles [to real property] in question for periods approaching 18 years." *Id. In re Doe Children,* 96 Hawai'i at 283–84, 30 P.3d at 889–90. *In re Doe Children* held that family court orders reflected the requisite degree of finality to establish appellate jurisdiction where

[t]he issue involved in the orders—who will pay for services needed to prevent future harm to Children—[wa]s sufficiently distinct from the question of Children's actual need for the services, such need establishing the rationale for the family court's continuing jurisdiction. Moreover, the interests at stake [we]re important and require[d] appellate resolution.... In short, the fact that the question of who [wa]s responsible for payment for particular services received by Children c[ould] be de-

---

court upon the same terms and conditions as in other cases in the circuit court and review shall be governed by chapter 602; provided that no such motion for reconsideration shall operate as a stay of any such findings, judgment, order, or decree unless the judge of the family court so orders; provided further that no informality or technical irregularity in the proceedings prior to the hearing on the motion for reconsideration shall constitute grounds for the reversal of any such findings, judgment, order, or decree by the appellate court.

22. HRS § 641–1(a) provides:

**Appeals as of right or interlocutory, civil matters.** (a) Appeals shall be allowed in civil matters from all final judgments, orders, or decrees of circuit and district courts and the land court, to the supreme court or to the intermediate appellate court, except as other-

wise provided by law and subject to the authority of the intermediate appellate court to certify reassignment of a matter directly to the supreme court and subject to the authority of the supreme court to reassign a matter to itself from the intermediate appellate court.

23. HRS § 641–1(b) provides:

(b) Upon application made within the time provided by the rules of court, an appeal in a civil matter may be allowed by a circuit court in its discretion from an order denying a motion to dismiss or from any interlocutory judgment, order, or decree whenever the circuit court may think the same advisable for the speedy termination of litigation before it. The refusal of the circuit court to allow an appeal from an interlocutory judgment, order, or decree shall not be reviewable by any other court.

cided independently from the need for the family court's continuing jurisdiction, coupled with the importance of obtaining a definitive ruling on the issue, establishe[d] that the "requisite degree of finality" [wa]s present to permit appellate jurisdiction.

*Id.* at 284, 30 P.3d at 890 (footnote and internal quotation marks omitted).

■ The focus of the present matter is the December 6, 2001 orders concerning the Child Protective Act regarding John, which ordered the DOE to place John in the eighth grade.[24] The December 6 orders were "not 'final' in that the family court retain[ed] continuing jurisdiction over [John] ... and no interlocutory orders were certified." *Id.* at 283, 30 P.3d at 889. Nevertheless, the issue involved in the December 6, 2001 orders— *i.e.,* whether John should be placed in the eighth or ninth grade—is distinct from the matter of John's obvious need for education in general, which establishes the rationale for the family court's continuing jurisdiction. Thus, the December 6, 2001 orders are final as to the narrow issue of John's proper grade placement. Furthermore, the interests at stake, namely, a child's proper education and the scope of the family court's subject matter jurisdiction, are important and require appellate resolution. Therefore, the fact that the question of John's grade placement can be decided independently of the need for the family court's continuing jurisdiction, coupled with the importance of obtaining a definitive ruling on the issue of the family court's sub-

ject matter jurisdiction, establishes the requisite degree of finality such that we may resolve the present matter.

### 2. *Perfection of appeal by filing motion for reconsideration*

In addition to the foregoing "finality" requirement, this court has noted that, "[b]y the plain language of the statute, a party desiring to appeal from an order entered in a proceeding governed by HRS § 571–54[, *see supra* note 21,] is required to file a motion for reconsideration." *In re Doe Children: John Doe, Born on December 22, 1997; John Doe, Born on December 22, 1997,* 94 Hawai'i 485, 486, 17 P.3d 217, 218 (2001) (citing *In re Doe,* 3 Haw.App. 391, 394, 651 P.2d 492, 494 (1982)). Thus, there is no appealable order until the family court resolves the motion for reconsideration. *Id.*

■ In the present matter, the DOE satisfied the foregoing requirement for perfecting an appeal from the December 6, 2001 orders, directing the DOE to place John in the eighth grade, because the DOE and the DHS filed a motion for reconsideration on October 1, 2001, which the family court adjudicated by entering the October 16, 2001 orders, denying the October 1, 2001 motion for reconsideration.[25] The DOE's right to assert an appeal under HRS § 571–54, *see supra* note 21, was therefore perfected when the family court entered the October 16, 2001 orders.[26]

24. The DOE prematurely filed its November 14, 2001 notice of appeal prior to the entry of the December 6, 2001 orders. Although the entry of the December 6 orders triggered the thirty day-time period for filing a notice of appeal pursuant to HRAP Rule 4(a)(1) (2001), HRAP Rule 4(a)(2) (2001) provides that "[i]n any case in which a notice of appeal has been filed prematurely, such notice shall be considered as filed immediately after the time the judgment becomes final for purposes of appeal." Thus, pursuant to HRAP Rule 4(a)(2), the effective date of the DOE's notice of appeal was December 6, 2001, such that the DOE's November 14, 2001 notice of appeal was timely filed.

25. Although HRS § 571–54 requires an aggrieved party to file a motion for reconsideration "[w]ithin twenty days from the date of the entry of any such order or decree," the DOE and DHS filed their October 1, 2001 motion for reconsideration more than twenty days prior to the entry of

the December 6, 2001 order requiring John's placement in the eighth grade. Nevertheless, when analyzing an analogous motion for reconsideration pursuant to Hawaii Rules of Civil Procedure (HRCP) Rule 59(e) (1993), this court held that the ten-day time limit for a motion for reconsideration "imposes only an outer time limit on the service of a motion to alter or amend the judgment," and "[a] motion served before the judgment is entered falls within that time constraint." *Saranillio v. Silva,* 78 Hawai'i 1, 7, 889 P.2d 685, 691 (1995). Likewise, a motion for reconsideration that is filed prior to entry of the final order falls within the twenty-day time constraint, such that the DOE and DHS timely filed the October 1, 2001 motion for reconsideration for purposes of HRS § 541–54.

26. The DOE did not need to file its second motion for reconsideration or its second notice of appeal. As discussed *supra* in section I.B.4,

### 3. *Mootness*

In its jurisdictional statement and opening brief, the DOE raises the question whether the matter of John's grade placement could be moot. In this connection, the DOE asserts that

> this [c]ourt has jurisdiction to hear and decide this issue because (1) the issues involved in the appeal are not moot because the family court's order that John . . . remain in the eighth grade was not limited to the current school year, and i[n] fact, all of the reasons articulated by the [family] court for keeping John . . . in 8th grade this year would argue for keeping him in 8th grade next year, and (2) even if the issues were moot, the issues involved are clearly a legal issue that is capable of repetition that would escape appellate review.

In response, the GAL contends that "[o]nce the DOE decided [on October 16, 2001] not to move John from 8th to 9th grade, the conflict became moot." We agree with the DOE.

It is established in Hawai'i that

> [a] case is moot where the question to be determined is abstract and does not rest on existing facts or rights. Thus, the mootness doctrine is properly invoked where "events . . . have so affected the relations between the parties that the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised."

*CARL Corp. v. State, Dept. of Educ.*, 93 Hawai'i 155, 164, 997 P.2d 567, 576 (2000) [hereinafter, "*CARL II*"] (quoting *In re Application of Thomas*, 73 Haw. 223, 226, 832 P.2d 253, 254 (1992) (quoting *Wong v. Board of Regents, University of Hawai'i*, 62 Haw. 391, 394, 616 P.2d 201, 203–04 (1980))).

For example, in *CARL II*, 93 Hawai'i at 165, 997 P.2d at 577, which . . . arose from a challenge to a governmental body's award of a procurement contract, we held that the hearings officer had correctly dismissed the unsuccessful bidder's appeal as moot because the contract at issue had been terminated. Consequently, [CARL], the party challenging the award of the contract to another bidder, had received the only relief available to it pursuant to the Procurement Code (*i.e.*, termination of the contract) and, as a result, the hearings officer was no longer in a position to decide whether to terminate or affirm the contract.

Similarly, in *Wong*, 62 Haw. at 396, 616 P.2d at 205, we held that Wong's appeal was moot because "there [was] nothing left to grant [the] appellant." Wong, a University of Hawai'i student at the time he instituted his lawsuit, sought (1) to enjoin a disciplinary hearing against him and (2) a declaratory judgment that the university's statement and procedures regulating student conduct were invalid, on the basis that they did not comply with the Hawaii Administrative Procedure Act (HAPA). *Id.* at 391, 616 P.2d at 202. The circuit court granted summary judgment in favor of the university and Wong appealed to this court. During the pendency of Wong's appeal, however, the university (1) agreed to terminate its disciplinary proceedings against Wong and (2) complied with HAPA. *Id.* at 394, 616 P.2d at 203. In addition, Wong graduated from the university. *Id.* at 396, 616 P.2d at 205. Accordingly, there was no longer either an adverse interest or an effective remedy available in the lawsuit.

. . . .

Nevertheless, we have repeatedly recognized an exception to the mootness doctrine in cases involving questions that af-

---

the DOE and DHS filed a second motion for reconsideration on December 24, 2001, which reasserted the same arguments that they had unsuccessfully advanced in the first motion for reconsideration, filed October 1, 2001. The DOE and DHS filed their second motion based on their mistaken belief that the first motion for reconsideration might be void because the first motion had been filed prior to the entry of

the December 6, 2001 orders, which required John's placement in the eighth grade. Nevertheless, as discussed *supra*, the DOE's and DHS's first motion for reconsideration successfully perfected the DOE's right to assert an appeal pursuant to HRS § 571–54, such that neither the second motion for reconsideration nor the second notice of appeal was necessary to perfect the DOE's right to appellate review.

fect the public interest and are "capable of repetition yet evading review." *CARL II,* 93 Hawai'i at 165, 997 P.2d at 577 (quoting *In re Thomas,* 73 Haw. 223, 226, 832 P.2d 253, 255 (1992)); *accord Mahiai v. Suwa,* 69 Haw. 349, 356, 742 P.2d 359, 365 (1987); *Kona Old Hawaiian Trails Group v. Lyman,* 69 Haw. 81, 87, 734 P.2d 161, 165 (1987); *Wong,* 62 Haw. at 395–96, 616 P.2d at 204; *Life of the Land v. Burns,* 59 Haw. 244, 252, 580 P.2d 405, 409–10 (1978); *Johnston v. Ing,* 50 Haw. 379, 381, 441 P.2d 138, 140 (1968). "Among the criteria considered in determining the existence of the requisite degree of public interest are the public or private nature of the question presented, the desirability of an authoritative determination for the future guidance of public officers, and the likelihood of future recurrence of the question." *Johnston,* 50 Haw. at 381, 441 P.2d at 140 (quoting *In re Brooks' Estate,* 32 Ill.2d 361, 205 N.E.2d 435, 437–438 (1965)).

> The phrase, "capable of repetition, yet evading review," means that "a court will not dismiss a case on the grounds of mootness where a challenged governmental action would evade full review because the passage of time would prevent any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit."

*CARL II,* 93 Hawai'i at 165, 997 P.2d at 577 (quoting *Burns,* 59 Haw. at 251, 580 P.2d at 409–10). In *CARL II,* we noted that, while public procurement contracts "clearly involve[ ] matters of public concern," the subject controversy did not qualify for the exception to the mootness requirement because "no additional 'authoritative determination' [was] needed regarding the terminated contract[.]" *Id.* As pointed out *supra,* the governmental body had already granted [CARL] the relief that it requested by terminating the disputed contract. In addition, this court had already explained in [*CARL Corp. v. State, Dept. of Educ.,* 85 Hawai'i 431, 458, 946

P.2d 1, 28 (1997) [hereinafter, "*CARL I*"] [27] precisely why the procurement process awarding the contract had been flawed. Consequently, there was no unsettled legal question for this court to address.

By contrast, in *Johnston,* we addressed one of the issues raised by the plaintiff in spite of the fact that the matter was moot. *Johnston* involved a dispute over an election ballot and the power of the circuit courts to prevent the use of "ballots not in conformity with the law and to compel officials to prepare and distribute proper ballots[.]" *Johnston,* 50 Haw. at 382, 441 P.2d at 140. We held that, although the election at issue had since passed, "the question [of the circuit courts' power to remedy defective ballots] affects the public interest, and it is likely in the nature of things that similar questions arising in the future would likewise become moot before a needed authoritative determination by an appellate court can be made[.]" *Id.,* at 381, 441 P.2d at 140. Consequently, this court held that the matter constituted an exception to the mootness doctrine.

*Okada Trucking Co., Ltd. v. Board of Water Supply,* 99 Hawai'i 191, 195–97, 53 P.3d 799, 803–05 (2002) (some brackets added and some in original).

The present matter was rendered moot by (1) the DOE's October 16, 2001 decision "to keep [John] in [the] eighth grade," and (2) John's continued academic progress since the DOE's November 14, 2001 notice of appeal. The GAL has therefore "properly invoked" the mootness doctrine, inasmuch as "the two conditions for justiciability relevant on appeal—adverse interest and effective remedy—have been compromised" by the DOE's October 16 capitulation and John's academic progress. *Okada Trucking Co., Ltd.,* 99 Hawai'i at 195–96, 53 P.3d at 803–04 (internal citations and quotation signals omitted).

Nevertheless, the question of the family court's subject matter jurisdiction concerning grade placement "affect[s] the public interest

---

27. In *CARL I,* this court held that

a protestor is entitled to recover its attorney's fees if: (1) the protestor has proven that the solicitation was in violation of the Code; (2)

the contract was awarded in violation of HRS § 103D–701(f); and (3) the award of the contract was in bad faith.

*CARL I,* 85 Hawai'i at 460, 946 P.2d at 30.

and [is] 'capable of repetition yet evading review[,]'" such that the issues involved in the present matter are excepted from the mootness doctrine. *Id.* at 196, 53 P.3d at 804. On its face, the scope of the family court's jurisdiction is "public" in "nature," and "the desirability of an authoritative determination for the future guidance of public officers" is highlighted by the family court's own admission during the October 11, 2001 hearing on the DOE's and DHS's October 1, 2001 motion for reconsideration:

> THE COURT: ... [W]here is the line? When the family court feels that a state agency—this is not just [the] DOE, this is all State agencies, if they're making a decision contrary to the best interests of the child, what is my duty as a family court judge under my powers and authorities and under the relevant statutes?
>
> I think we have to continue to push the envelope and to have broad discretion in making decisions which mandate that the best interest of the child be followed.

*Id.* at 196–97, 53 P.3d at 804–05 (internal citations omitted). As to "the likelihood of future recurrence of the question[,]" the family court could conceivably intervene every time a GAL disagreed with a child's grade placement or any other aspect of an IEP (*e.g.*, the child's teacher, curriculum, etc.), and the foregoing queries by the family court indicate that the question of subject matter jurisdiction is not confined to issues involving the DOE, but, rather, concerns "all State agencies," expanding the range of potential conflicts that could arise in the future. *Id.*

Moreover, conflicts over grade placement decisions "evade full review because the passage of time [ (*i.e.*, a child's academic progress) ] ... prevent[s] any single plaintiff from remaining subject to the restriction complained of for the period necessary to complete the lawsuit." *Id.* at 197, 53 P.3d at 805. Indeed, the question of the family court's subject matter jurisdiction over grade placement is analogous to the question of the circuit courts' power to remedy defective bal-

lots at issue in *Johnston,* which "bec[a]me moot before a needed authoritative determination by an appellate court [could have been] made," but nevertheless "affect[ed] the public interest, and ... [was] likely ... [to] aris[e] in the future...." *Id.* We therefore hold that the instant case falls within the foregoing exception to the mootness doctrine.

> B. *Pursuant To The Statutory And Regulatory Scheme Underlying The IDEA And HRS Chapter 587, The Family Court Lacked Subject Matter Jurisdiction To Order The DOE To Place John In The Eighth Grade.*

The DOE argues on appeal (1) that the family court lacked the authority to enter an order in violation of the IDEA, *see supra* note 2, and the *Felix* consent decree, *see supra* note 3, and (2) that the family court is a court of limited jurisdiction, which does not extend to deciding the educational placements of children. In response, the GAL contends (1) that the family court has inherent authority under HRS Chapters 571 and 587, *see supra* notes 4 and 5, to order the DOE to place John in the eighth grade, (2) that the family court is obligated to assist John's legal custodian in remedying the problems that put the child at substantial risk of harm, and (3) that administrative review was unavailable and the IEP process was stalemated, effectively denying John his right to due process of law, thereby supplying an additional basis for the family court to intervene. We agree with the DOE.

As further discussed *infra,* we apply our reasoning in *In re Doe Children,* which addressed the scope of the family court's subject matter jurisdiction by determining whether the family court could appropriately (1) exercise judicial review of the DOE's administrative proceedings pursuant to the IDEA or (2) act as a court of primary jurisdiction pursuant to state law, on grounds independent of the IDEA.[28] 96 Hawai'i at 284–89, 30 P.3d at 890–95.

---

**28.** Inasmuch as we decide *infra* that the family court did not have subject matter jurisdiction over the present matter, we need not and do not address the DOE's contention that, even if the

family court possessed jurisdiction to review the decisions of the DOE regarding grade placement of children, it did not employ the correct standard in reviewing the DOE's decision.

1. *The district family court cannot exercise judicial review pursuant to the IDEA because (a) GALs do not have standing to request an administrative hearing and cannot avail themselves of the "futility exception" and (b) the family court is not a "court of competent jurisdiction."*

As discussed *supra* in section I.A, "Hawai'i has established the required review process for complaints related to FAPE through a statutory and regulatory scheme[,]" including the right of "any parent or guardian of a handicapped child, or . . . [the DOE], [to request an impartial hearing] on any matter relating to the . . . placement of a handicapped child." *In re Doe Children*, 96 Hawai'i at 287, 30 P.3d at 893. HAR § 8–56–78 allows " 'any party' aggrieved by the results of the due process hearing [to] bring a civil action *'in any state court of competent jurisdiction'* or in federal district court." *Id.* (emphasis added). *In re Doe Children* noted that "[e]xhaustion of this administrative process is *mandatory* prior to seeking judicial review." *Id.* (citing *Kona Old Hawaiian Trails Group v. Lyman*, 69 Haw. 81, 93, 734 P.2d 161, 169 (1987); *Honig v. Doe*, 484 U.S. 305, 326–27, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988)) (emphasis added). Nevertheless, "[a]n aggrieved party need not exhaust administrative remedies where no effective remedies exist." *Id.* at 287 n. 20, 30 P.3d at 893 n. 20 (quoting *Hokama v. University of Hawai'i*, 92 Hawai'i 268, 273, 990 P.2d 1150, 1155 (1999)) (internal quotation signals omitted). "[T]he burden of proving that any particular administrative remedy is futile rests with the litigant seeking to bypass it." *Id.* (citing *Honig*, 484 U.S. at 327, 108 S.Ct. 592).

It is undisputed in the present matter that the GAL did not exhaust the administrative process prior to seeking judicial review, the GAL contending that "all interested parties [were] precluded from appealing the [ninth grade placement] decision due to lack of standing . . . [and] neither the [s]urrogate [p]arent or the school sought administrative review[.]" In its January 14, 2001 COLs

supporting its December 6, 2001 order requiring the DOE to place John in the eighth grade, the family court concluded, *inter alia*, that "[i]t would be futile for the GAL or [John's] foster parents to request an administrative hearing on the issue of grade placement, since neither had standing under the applicable rules and laws." Thus, although the majority of the family court's COLs concern the independent state-law basis by which the family court purported to assert subject matter jurisdiction, it appears that the family court also undertook to exercise judicial review of the IDEA's administrative process. *See supra* section I.B.4; *see also infra* section III.B.2.

a. *Lacking standing to pursue an IDEA claim, the GAL could not avail herself of the "futility exception."*

As discussed *supra*, the GAL conceded both in her answering brief and before the family court that neither she nor John's foster parents had standing to request an administrative hearing, and the family court reached the same conclusion. *See supra* sections I.B.2, 4 (quoting the GAL's thorough explanation of her lack of standing at the September 5, 2001 hearing and the family court's January 14, 2002 COLs). The HARs state that only "parents or the [DOE] may initiate . . . hearing[s]," HAR § 8–56–72(a), and exclude GALs from the definition of "parents" for purposes of the IDEA. *See supra* section I.A (quoting HAR § 8–56–2). Moreover, HAR § 8–56–2 requires foster parents to have a "long-term parental relationship with the student." John's foster parents were therefore ineligible as "parents" under the IDEA, inasmuch as John had been placed with them in July 2001, only one month prior to the commencement of the present matter. As a result of the IDEA's standing requirements, the GAL could neither request an administrative hearing nor seek judicial review of the administrative process.[29] *See* HAR §§ 8–56–72(a) and 8–56–2.

---

29. *Cf. Taylor v. Vermont Dep't of Educ.*, 313 F.3d 768 (2d Cir.2002). In *Taylor*, the United States Court of Appeals for the Second Circuit held that a non-custodial parent pursuing a records-access

By the same token, and by virtue of her lack of standing, the GAL cannot circumvent the administrative process by claiming that the regulatory scheme rendered futile any request for an administrative hearing. As we explained in *In re Doe Children*, "[o]rdinarily, futility refers to the inability of an administrative process to provide the appropriate relief[.]" 96 Hawai'i at 287 n. 20, 30 P.3d at 893 n. 20 (citing *Hokama*, 92 Hawai'i at 273, 990 P.2d at 1155).

The bases of the "futility exception" in our jurisprudence underscore the doctrine's focus upon the adequacy of administrative remedies. In *Hokama*, this court excused an employee of the University of Hawai'i, who otherwise had standing, from timely filing a grievance with the university because "[i]t [was] entirely unclear ... whether the damages sought by [the plaintiff were] available under the grievance procedure." 92 Hawai'i at 273, 990 P.2d at 1155. The *Hokama* court reasoned that "[a]n aggrieved party need not exhaust administrative remedies where no effective remedies exist." *Id.* (citing *Winslow v. State*, 2 Haw.App. 50, 56, 625 P.2d 1046, 1051 (1981); *see also Lane v. Yamamoto*, 2 Haw.App. 176, 178–79, 628 P.2d 634, 636 (1981); *Waugh v. University of Hawaii*, 63 Haw. 117, 129, 621 P.2d 957, 967 (1980)). In *Winslow*, the Intermediate Court of Appeals (ICA) held "that [the] appellant could

not be required to exhaust contractual remedies in an action against [a] union where no such remedies actually exist[ed]." 2 Haw. App. at 56, 625 P.2d at 1051. In *Lane*, "there was no set procedure which was available for the appellant to follow in seeking the return of his property[,]" and the ICA therefore noted that "[o]ne cannot exhaust an administrative remedy if there is no administrative remedy." 2 Haw.App. at 178–79, 628 P.2d at 636. The *Waugh* court similarly observed that the "[a]ppellant was not required to follow University [of Hawai'i's] administrative procedures[,]" inasmuch as "there were no established internal procedures for handling claims such as [the appellant's]." 63 Haw. at 129, 621 P.2d at 967.

By contrast, the IDEA's administrative process is specifically designed to afford John an effective remedy and to protect his right to FAPE. *See supra* section I.A. John's surrogate parent, who was appointed, pursuant to HAR § 8–56–80, to "ensure that the rights of a student are protected when ... [t]he student is a ward of the State," could have requested an impartial due process hearing on the issue of John's grade placement, but chose not to do so. The source of the alleged "futility," therefore, is not the administrative process but, rather, the party who was seeking relief. Simply put, the GAL cannot avail herself of the "futility exception"

claim under the IDEA against school official was exempted from the exhaustion requirement of the IDEA on the grounds of futility and the inadequacy of the administrative remedies. 313 F.3d at 789. The non-custodial parent's prior attempt to exhaust administrative remedies, in a proceeding against the first regional school board that possessed jurisdiction prior to the child's move to a different region, had failed for lack of standing and was dismissed by a hearing officer of the Vermont Department of Education. *Id.* at 772–74. The Second Circuit agreed with the United States District Court that "requiring exhaustion of administrative remedies [against the second regional school board that had had jurisdiction after the child moved] would [have] be[en] futile[.]" *Id.*

*Taylor* is distinguishable from the present matter because the party seeking relief, *i.e.*, the non-custodial parent, actually had a "special" form of standing, inasmuch as she retained the "right to reasonable information regarding the child's progress in school and her health and safety" under a divorce decree, although the custodial parent retained all other legal rights and respon-

sibilities regarding the child. *Id.* at 772–73 (internal quotation signals omitted). The *Taylor* court noted that the non-custodial parent could avail herself of the "futility exemption" because, notwithstanding that the divorce decree allowed her to retain the right to "reasonable information," the federal and state IDEA regulations did not expressly confer standing on her, and the second regional school board was likely to reach the same conclusion as the first (*i.e.*, that she lacked standing). *Id.* at 789. Aside from permitting the non-custodial parent to pursue her records-access claim despite her failure to exhaust, the Second Circuit found that the non-custodial parent "[did] not have standing to pursue her remaining claims [and therefore] address[ed] only whether [she] was required to exhaust her administrative remedies against the [second regional school board] in order to pursue her IDEA record-access claim." *Id.* at 788 n. 17.

In the present matter, no such "special" right to standing is applicable to the GAL or John's foster parents. *See* HAR §§ 8–56–72(a) and 8–56–2. *Taylor* is therefore distinguishable and does not bear upon our analysis.

precisely because the administrative process *could have* provided John the appropriate relief, notwithstanding that the GAL did not have standing to seek such relief. To hold otherwise would allow the family court to obviate the entire federal-state statutory and regulatory scheme underlying the IDEA. *See supra* section I.A.

b. *The district family court is not a "court of competent jurisdiction" within the meaning of the IDEA.*

■ Pursuant to HRS § 91–14 (1993),[30] and with respect to the right of an aggrieved party to challenge the outcome of the DOE's administrative proceedings "in any state court of competent jurisdiction[,]" *see* HAR § 8–56–78, the proper forum in which to seek relief is not the district family court, but rather the circuit court. We take judicial notice that, at the time the present matter arose, Judge Bryant was a judge in the district family court, which was established pursuant to HRS § 571–8 (1993).[31] Although a circuit court judge would have possessed the jurisdiction to engage in judicial review of John's contested case, *see Adams v. State,* 103 Hawai'i 214, 222, 81 P.3d 394, 402 (2003) ("notwithstanding any lack of jurisdiction on the part of *the family court* ..., *Judge Amano,* in her capacity as a circuit court judge, properly exercised jurisdiction") (emphases in original); HRS § 571–4 (1993) ("Nothing in this chapter shall be construed to limit the jurisdiction and authority of any circuit court

judge, designated as a judge of a family court, to matters within the scope of this chapter."), HRS § 91–14(b) does not confer the same powers upon the district family courts. The family court therefore was not a "court of competent jurisdiction" for purposes of judicial review of the administrative proceedings.

2. *There is no independent state-law basis for family court jurisdiction in this matter.*

This court's decision in *In re Doe Children* explained the scope of the family court's jurisdiction as follows:

The family court is a court of limited jurisdiction and, as such, derives its authority from the statutes that created it. *See Cleveland[ v. Cleveland* ], 57 Haw. 519,] 520, 559 P.2d [744,] 746[ (1977) ]; *In re Doe,* 86 Hawai'i 517, 520, 950 P.2d 701, 704 (App.1997). The family court's jurisdiction is defined by HRS § 571–11 (1993), which states in relevant part:

Except as otherwise provided in this chapter, the court shall have exclusive original jurisdiction in proceedings:

. . . .

(9) For the *protection of any child under chapter 587* [the Child Protective Act].

(Emphasis added). Thus, jurisdiction in chapter 587 cases is conferred upon the

---

30. HRS § 91–14 provides in relevant part:
 **Judicial review of contested cases.** (a) Any person aggrieved by a final decision and order in a contested case or by a preliminary ruling of the nature that deferral of review pending entry of a subsequent final decision would deprive appellant of adequate relief is entitled to judicial review thereof under this chapter; but nothing in this section shall be deemed to prevent resort to other means of review, redress, relief, or trial de novo, including the right of trial by jury, provided by law. Notwithstanding any other provision of this chapter to the contrary, for the purposes of this section, the term "person aggrieved" shall include an agency that is a party to a contested case proceeding before that agency or another agency.
 (b) Except as otherwise provided herein, *proceedings for review shall be instituted in the circuit court* within thirty days after the preliminary ruling or within thirty days after service

of the certified copy of the final decision and order of the agency pursuant to rule of court except where a statute provides for a direct appeal to the supreme court, which appeal shall be subject to chapter 602, and in such cases the appeal shall be in like manner as an appeal from the circuit court to the supreme court, including payment of the fee prescribed by section 607–5 for filing the notice of appeal (except in cases appealed under sections 11–51 and 40–91). The court in its discretion may permit other interested persons to intervene. . . .
(Emphasis added.)

31. HRS § 571–8(a) provides that, "[i]n addition to the district courts established under section 604–1, there may be established in each of the judicial circuits of the State a district family court. . . ."

family court pursuant to HRS § 571–11(9). As HRS § 587–11 explains:

> Pursuant to [section] 571–11(9), the [family] court shall have exclusive original jurisdiction in a child protective proceeding concerning any child who was or is found within the State at the time the facts and circumstances occurred, are discovered, or are reported to [DHS], which facts and circumstances constitute the basis for the finding that the child *is a child whose physical or psychological health or welfare is subject to imminent harm*, has been harmed, or is subject to threatened harm by the acts or omissions of the child's family.

(Emphasis added.) (Some brackets in original.) Therefore, the primary focus of the court's jurisdiction in such cases is to prevent harm to the child.

96 Hawai'i at 284–85, 30 P.3d at 890–91 (some emphases added and some in original). In cases in which the Child Protective Act applies and permanent custody of a child is awarded to the State, HRS § 587–73(b)(4) empowers the family court to issue *"such further orders as the court deems to be in the best interests of the child. . . ." See supra* note 5 (emphasis added).

With regard to the scope of the family court's jurisdiction, *In re Doe Children* observed that

> the purposes of the Child Protective Act should be broadly construed. In defining the purposes of the Act, HRS § 587–1 (Supp.2000) states in relevant part:
>
> > This chapter creates within the jurisdiction of the family court a child protective act to make paramount the safety and health of children who have been harmed or are in life circumstances that threaten harm. Furthermore, this chapter makes provisions for the service, treatment, and permanent plans for these children and their families.
> >
> > . . . .
> >
> > This chapter *shall be liberally construed* to serve the best interests of the children and the purposes set out in this chapter.

(Emphasis added.) Thus, this court gives deference to decisions of the family court made pursuant to its chapter 587 authority to issue orders that are in the best interests of a child to prevent harm or threatened harm.

> *However, the family court's jurisdiction is not so broad that it extends to the ability to simply [issue] orders. . . . Obviously, there must be a legal basis establishing an obligation [to comply]. . . . Therefore, the family court has jurisdiction to order persons or entities . . . when such person or entity is legally obligated to [comply].*

96 Hawai'i at 285–86, 30 P.3d at 891–92 (some emphases added and some in original).

In *In re Doe Children*, the DOH appealed from the order of the family court requiring the DOH to pay for mental health services for a child who was a ward of the state. *Id.* at 280–83, 30 P.3d at 886–89. This court held that, although there was an independent state-law basis for the family court to order the *DHS* to pay for mental health services for a child who was the ward of the state, the family court could not order the *DOH* to do so "in the absence of a basis in the record for establishing the *DOH's* specific legal obligation[.]" *Id.* at 288, 30 P.3d at 894 (emphasis added). In particular, this court reasoned as follows:

> As permanent co-custodians of John, DHS and [his foster parents] are required, among other things, to "assure that [John] is provided in a timely manner with adequate food, clothing, shelter, psychological care, physical care, medical care, supervision, and other necessities[.]" HRS § 587–2 (1993). Moreover, an important impetus behind the co-custodial arrangement was to ensure that the State, through DHS, continued to provide financial support for John. *See supra* at 280, 30 P.3d at 886. . . .
>
> Under these circumstances, we hold that the family court correctly concluded that an independent state basis exists under which John is entitled to receive payment for the mental health services regardless of whether he is eligible to receive payment pursuant to the IDEA. In its COL

No. 7, which states that [John's foster parents], "along with [DHS], as co-permanent custodians of [John], are obligated to provide for [John's] special educational needs, and [John's] mental health needs[,]" the family court identified DHS—John's co-custodian—as the state agency legally responsible for John's welfare. Consequently, the family court's order requiring DOH to pay for the services, in the absence of a basis in the record for establishing DOH's specific legal obligation, unnecessarily infringes upon the prerogative of state executive agencies to determine the appropriate means by which DHS is obligation to John is to be fulfilled. For example, it may well be that, as the executive agency ultimately responsible for John, DHS would pay for the services directly. Alternatively, it may be appropriate that, based upon administrative guidelines establishing John's eligibility to receive services provided by a particular program administered by DOH, DHS would arrange to have DOH pay for or provide John's mental health services.

For this court to make a decision as to which state agency or program must pay for the particular services at issue on the basis of the incomplete record before us would unnecessarily infringe upon the prerogative of executive agencies to establish and maintain programs that fulfill their respective responsibilities. Further, it may result in the inappropriate diversion of resources from one program when another is better suited to attend to John's needs. We believe that DHS, as the executive agency legally responsible for fulfilling the State's obligation to John, should have primary responsibility for these decisions. The family court's role is to prevent harm to John by ensuring that his custodians act in his best interest and by issuing appropriate orders, including ordering an entity to pay for services when it has an obligation to do so. *See* HRS § 587–76. Therefore, we vacate the family court order requiring DOH to pay for John's services because the record does not establish DOH's obligation to pay for the services.

In its ongoing supervision of John's case, the family court may ascertain from DHS how it will ensure that the state-based obligation to provide for John's mental health services will be fulfilled. If DHS is unable to articulate the means by which the State's executive agencies will fulfill its obligation to John, the family court may, consistent with the holding in this case and with the family court's duty to protect John, order DHS to pay for John's services. *Cf. In re Doe,* 74 Haw. 409, 412, 849 P.2d 55, 57 (1993) (stating that "it is specious to argue that the DHS can control the court's jurisdiction over certain matters by simply rearranging its budget to avoid statutorily imposed responsibilities to care for foster children")....

*Id.* at 288–89, 30 P.3d at 894–95 (some emphases added and some in original).

 In the present matter, pursuant to HRS § 571–11(9), *see supra* note 4, the family court does have "exclusive original jurisdiction in proceedings ... [c]oncerning any child living or found within the circuit ... [w]ho is ... deprived of educational services because of the failure of any ... agency to exercise that degree of care for which it is legally responsible." Nevertheless, as discussed *supra*, "the family court's jurisdiction is not so broad that it extends to the ability to simply [issue] orders"; in other words, "there must be a legal basis establishing an obligation [to comply]." *In re Doe Children,* 96 Hawai'i at 286, 30 P.3d at 892. The DHS, as John's permanent custodian, is bound, *inter alia,* by the following legal obligations: (1) to "monitor the provision to the child of appropriate education[,]" HRS § 587–2; (2) to "provide all consents that are required for the child's ... educational ... needs[,]" HRS § 587–2; and (3) to file a permanent written plan that includes "[t]he objectives concerning the child, including, ... education," HRS § 587–27. *See supra* note 5. Moreover, pursuant to HRS § 587–73(b)(4), the family court may issue "such further orders as the court deems to be in the best interests of the child...." *See supra* note 5.

The family court's jurisdiction, however, is limited by the boundaries of the foregoing legal obligations, which pertain to the responsibility of the *DHS* and not the *DOE*. We therefore reiterate the reasoning of *In re*

*Doe Children* in holding that "the family court's order requiring [the DOE to place John in the eighth grade], in the absence of a basis in the record for establishing [the DOE's] specific legal obligation, unnecessarily infringes upon the prerogative of state executive agencies to determine the appropriate means by which [the] DHS's obligation to John is to be fulfilled." *In re Doe Children*, 96 Hawai'i at 288, 30 P.3d at 894.

## IV. *CONCLUSION*

In light of the foregoing, we hold (1) that GALs do not have standing to pursue an IDEA claim and cannot avail themselves of the "futility exception" to the requirement of administrative exhaustion; (2) that the district family courts may not exercise judicial review of administrative proceedings conducted pursuant to the IDEA; and (3) that the district family courts lack subject matter jurisdiction, under any circumstances, to order the DOE to alter a child's grade placement. Accordingly, we reverse the family court's September 10, 2001 and October 16, 2001 orders.

