99 P.3d 96

**ALLSTATE INSURANCE COMPANY,**
Plaintiff–Appellee,

v.

Brian E. PONCE, Defendant–Appellee,

and

Alberto A.F. Silva, Defendant–Appellant.

No. 23835.

Supreme Court of Hawai'i.

Oct. 6, 2004.

446

Lisa Ginoza, Philip W. Miyoshi, Honolulu, (McCorriston, Miller, Mukai, MacKinnion) on the briefs, for the plaintiff-appellee Allstate Insurance Company.

Philip L. Carey, of Ahmadia & Carey, on the briefs, for defendant-appellant Alberto A.F. Silva.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by LEVINSON, J.

The defendant-appellant Alberto A.F. Silva appeals from (1) the findings of fact (FOFs) and conclusions of law (COLs), entered August 29, 2000, and (2) the judgment, entered September 26, 2000, of the circuit court of the third circuit, the Honorable Greg K. Nakamura presiding. On appeal, Silva argues that the circuit court erred in granting declaratory judgment in favor of the plaintiff-appellee Allstate Insurance Company [hereinafter, "Allstate"], insofar as: (1) Allstate violated Hawai'i Revised Statutes (HRS) § 431:10C–111 (1993)[1] by cancelling the defendant-appellee Brian Ponce's[2] "Hawai'i Joint Underwriting Plan"[3] (HJUP) no-fault motor vehicle insurance policy; (2) "constru-

---

1. HRS § 431:10C–111 provided in relevant part:

   **Cancellation and nonrenewal of policies: when prohibited, when permitted.** (a) An insurer may not cancel or refuse to renew a no-fault policy, including required optional additional insurance meeting the provisions of section 431:10C–302, once issued except when:
   (1) The license of the principal operator to operate the type of motor vehicle is suspended or revoked;
   (2) Premium payments for the policy are not made after reasonable demand therefor; or
   (3) The nonrenewal or conditional renewal is limited in accordance with section 431:10C–111.5.
   Effective January 1, 1998, the legislature amended HRS § 431:10C–111 in respects not pertinent to the present matter. *See* 1997 Haw. Sess. L. Act 219, § 22 at 527–28.

2. Ponce filed no answering brief.

3. HRS § 431:10C–401 (1993) provides:

   **Participation.** (a) A joint underwriting plan is established consisting of all insurers authorized to write and engage in writing motor vehicle insurance in this State, except those insurers writing motor vehicle insurance exclusively under section 431:10C–106.
   (b) Each insurer shall be a member of the plan and shall maintain membership as a condition of its licensure to transact such insurance in this State.
   In *Allstate Ins. Co. v. Schmidt*, 104 Hawai'i 261, 262 n. 3, 88 P.3d 196, 197 n. 3 (2004), we explained that
   [t]he purpose of the JUP is to "assur[e] that insurance for motor vehicles will be conveniently and expeditiously afforded ... to all applicants for insurance ... who cannot reasonably obtain insurance at rates not in excess of those applicable to applicants under the plan, or who otherwise are in good faith entitled to, but unable to obtain, the insurance through ordinary methods." HRS § 431:10C–407(a) (1993 & Supp.2003). [*See infra* note 5.]

ing Allstate's confusing and contradictory [correspondence] ... in favor of Ponce, cancellation was attempted after only 27 days

4. HRS § 431:10C–112 provides in relevant part:

**Notice of cancellation or nonrenewal; effect on term of coverage.** (a) In any case of cancellation or refusal to renew, the insurer shall give written notice to the insured not less than thirty days prior to the effective date of the cancellation or refusal to renew. Cancellation or refusal to renew shall not be deemed valid unless supported by a certificate of mailing properly validated by the United States Postal Service.

5. HRS § 431:10C–407 provided:

**Classifications.** (a) The commissioner shall establish classifications of eligible persons and uses for which the joint underwriting plan shall provide both the required no-fault policies and any optional additional insurance an eligible person or user applies for. The commissioner shall, by regulation, establish, implement, and supervise the joint underwriting plan, through the bureau, assuring that insurance for motor vehicles will be conveniently and expeditiously afforded, subject only to payment or provision for payment of the premium, to all applicants for insurance required by this part to provide insurance for payment of bodily injury and property damage liability insurance, or optional additional benefits, and who cannot reasonably obtain insurance at rates not in excess of those applicable to applicants under the plan, or who otherwise are in good faith entitled to, but unable to obtain, the insurance through ordinary methods.

(b) The plan shall provide all no-fault benefits and services and bodily injury and property damage liability coverages to the limits and coverages specified in this article for all classes of persons, motor vehicles, and motor vehicle uses specified in this article upon the payment of premiums as provided in subpart C, as follows:

. . . .

(2) The plan shall provide no-fault benefits and bodily injury and property damage policies for all classes of persons, motor vehicles, and motor vehicle uses, at the premiums specified under subpart C, at the option of the owners, for the following classes, which the commissioner, by rules, shall further define and regulate:

(A) All licensed drivers, or unlicensed permanently disabled individuals unable to operate their motor vehicles, who are receiving public assistance benefits consisting of direct cash payments through the department of human services, or benefits from the supplemental security income program under the Social Security Administration; provided that the licensed drivers, or unlicensed permanently disabled individuals unable to operate their motor vehicles, are the sole registered owners of the motor vehicles to be insured; provided further

notice and is invalid under [HRS § 431:10C–112 (1993)[4]]"; (3) pursuant to (a) HRS §§ 431:10C–407 (1993)[5] and 431:10C–111, (b)

that not more than one vehicle per public assistance unit shall be insured under this part, unless extra vehicles are approved by the department of human services as being necessary for medical or employment purposes; provided further that the motor vehicle to be insured shall be used strictly for personal purposes, and not for commercial purposes; and

(B) Any licensed physically handicapped driver, including drivers with any auditory limitation.

Each category of driver/owner under subparagraphs (A) and (B) may secure no-fault coverage through the plan at the individual's option, provided any previous no-fault policy has expired or has been canceled. Any person becoming eligible for plan coverage under subparagraph (A) shall first exhaust all paid coverage under any no-fault policy then in force before becoming eligible for plan coverage.

Any person eligible or becoming eligible under rules adopted by the commissioner under subparagraph (B), may at any time elect coverage under the plan and terminate any prior private insurer's coverage.

A certificate shall be issued by the department of human services indicating that the person is a bona fide public assistance recipient as defined in subparagraph (A). The certificate shall be deemed a policy for the purposes of chapter 431 upon the issuance of a valid no-fault insurance identification card pursuant to section 431:10C–107.

(3) Under the joint underwriting plan, the required motor vehicle policy coverages as provided in section 431:10C–301 shall be offered by every insurer to each eligible applicant assigned by the bureau. In addition, uninsured motorist and underinsured motorist coverages shall be offered in conformance with section 431:10C–301, and optional additional coverages shall be offered in conformance with section 431:10C–302, for each class except that defined in paragraph (2)(A), as the commissioner, by rules, shall provide.

(c) The commissioner may further refine the definitions of the classifications provided for in subsection (b).

Effective January 1, 1998, the legislature amended HRS § 431:10C–407 in respects not pertinent to the present matter. *See* 1997 Haw. Sess. L. Act 251, § 51 at 545–47. Effective July 20, 1998, the legislature again amended HRS § 431:10C–407 in respects not germane to the present matter. *See* 1998 Sess. L. Act 275, § 31 at 936–38. Effective June 28, 1999, the legislature further amended HRS § 431:10C–407 in respects not relevant to the present matter. *See* 1999 Haw. Sess. L. Act 142, § 3 at 458–49. Effective January 1, 2002, HRS § 431:10C–407 was again amended in respects not pertinent to the present matter. *See* Haw. Sess. L. Act 157, § 32 at 401–03.

Hawai'i Administrative Rules (HAR) §§ 16–23–73 (1993),[6] 16–23–77 (1993),[7] 17–654–3 (1994),[8] and 17–654–5 (1993),[9] (c) the express terms of the " 'Certificate of Eligibility' for Hawaii No–Fault Insurance through the [HJUP] Bureau," [10] and (d) the prior prac-

**6.** HAR § 16–23–73 provided:

*Public assistance benefits recipients.* (a) The state department of human services (DHS) shall provide a certificate of eligibility for JUP coverage to eligible licensed drivers and unlicensed permanently disabled individuals unable to operate their motor vehicle, who are receiving public assistance benefits from the department or from the Supplemental Security Income program under the Social Security Administration and who desire basic no-fault policy coverage under JUP; provided such licensed drivers and unlicensed permanently disabled individuals unable to operate their motor vehicle are the sole registered owners of motor vehicles to be insured under the JUP. The applicant shall submit the certificate in person or by mail to the servicing carrier of the applicant's choice for a no-fault policy. The certificate shall be accepted by the servicing carrier and treated as if it were payment in full for the requested no-fault coverages. The servicing carrier shall certify this certificate which will function as a no-fault policy and issue the applicant a no-fault insurance identification card. The servicing carrier shall develop the information necessary to validate the eligibility of the applicant. Only basic no-fault policy coverages, as defined in sections 16–23–4, 16–23–5, and 16–23–9, shall be bound, and the effective date of coverage shall be the same date as the signature date on the certificate by the applicant; however, the effective date shall not precede the time and date of the certification of eligibility by the state department of human services. The servicing carrier shall promptly notify the director of human services of public assistance recipients which it insures.
(b) An applicant shall first exhaust all paid coverage under any no-fault policy then in force before becoming eligible for JUP coverage.
(c) Upon termination of public assistance benefits, the DHS shall:
(1) Notify the recipient upon termination of public assistance benefits and instruct the recipient that the recipient must immediately notify the servicing carrier of the termination of benefits and obtain timely insurance for the recipient's vehicle;
(2) Give written notice to the recipient that the recipient's JUP basic no-fault policy will terminate thirty days from the date of termination of public assistance benefits. This notice of cancellation shall be considered as proper notification under section 431:10C–112, HRS, and section 16–23–15, providing the recipient with thirty days notice of cancellation; and

(3) Notify the servicing carrier of the termination of public assistance benefits and the date the termination was effective.
Effective January 1, 1998, and again on January 8, 1999, the State of Hawai'i Department of Commerce and Consumer Affairs amended HAR § 16–23–73 in respects not relevant to the present matter.

**7.** HAR § 16–23–77 provides:
*Servicing carrier's duties.* A servicing carrier shall:
(1) Accomplish confirmation of rating criteria, such as an applicant's or policyholder's driving record;
(2) Issue insurance policies and endorsements, and certify the eligibility certificates within fifteen working days after receipt of an application for JUP coverage;
(3) Effectively and efficiently perform all necessary accounting and statistical procedures set forth in the JUP manual;
(4) Collect the necessary data to disburse commission payments to agents and be able to store the data and transmit it to the Internal Revenue Service annually; and
(5) Account to the commissioner as required, and take such action as the commissioner may properly require.

**8.** HAR § 17–654–3 provides in relevant part:
*Eligibility for Hawaii no-fault auto insurance.* An individual shall meet the following conditions in order to receive Hawaii no-fault auto insurance at no cost:
. . . .
(3) The individual shall be the sole registered owner of the vehicle.

**9.** HAR § 17–654–5 provides:
*Certificate of eligibility.* The eligible household shall mail or present a certificate of eligibility form issued by the department to one of the insurance companies which is under the Hawaii joint underwriting plan servicing carriers to obtain benefits of a Hawaii no-fault auto insurance policy.

**10.** Silva notes that the Certificate of Eligibility, *inter alia*, expressly "certif[ies] that . . . Ponce . . . is the sole registered owner of the vehicle to be insured." The certificate further states that "Section C," the "NOTICE OF TERMINATION OF BENEFITS/VEHICLE COVERAGE" portion, is "[t]o be completed by DHS and sent to servicing carrier when recipient is no longer eligible for public assistance benefits or vehicle is no longer approved for no-fault insurance coverage at no cost."

tices of the State of Hawai'i Department of Human Services (DHS) in administering the HJUP, only the DHS should be authorized to cancel an HJUP no-fault insurance policy; (4) assuming *arguendo* that Allstate was authorized to cancel Ponce's policy, Allstate's

method of cancellation was unreasonable under the circumstances; and (5) the circuit court's FOF No. 15 that "[o]n or about June 10, 1997, Allstate sent to the DHS an advisory that it was not able to validate the Certificate of Eligibility because Ponce did not provide a current vehicle registration in his own name[,]" and COL No. 14 that Allstate "properly reported to the DHS that Allstate could not validate the Certificate of Eligibility[,]" were clearly erroneous based on the evidence adduced at trial. Silva also challenges COL No. 16, which granted declaratory judgment in favor of Allstate on the bases that Allstate owed no duty (1) to defend or indemnify Ponce regarding the subject motor vehicle accident (MVA) or (2) to make payments to any person or entity under the subject policy in connection with the MVA.

Allstate responds that the circuit court did not err in concluding that "Ponce's failure to submit proof of registration terminated his policy" because: (1) "Ponce failed to meet an absolute requirement for HJUP insurance for public assistance recipients"; (2) "Allstate properly issued a temporary policy to allow Ponce to comply with HJUP requirements"; and (3) "Allstate acted in accordance with policies promulgated by the HJUP Board." Allstate further asserts (4) that the circuit court did not err in finding that Allstate sent the DHS a notice of termination, (5) that "Allstate's actions were reasonable under the circumstances[,]" and (6) that "Allstate properly provided Ponce with a notice of cancellation[.]"

Silva replies: (1) that, notwithstanding Allstate's contention that it "properly issued a temporary policy," (a) Ponce's policy was not "temporary," and (b) even assuming *arguendo* that it was temporary due to the expiration date on the "no-fault" cards, Allstate's request that Ponce return the cards after 27 days would have cancelled the policy and violated HRS § 431:10C–112; (2) "Allstate's failure to notify Ponce or DHS of the cancellation was unreasonable and a breach of its duty of good faith towards Ponce"; (3) "Allstate had other methods and means to give reasonable notice to Ponce of the cancellation"; and (4) "Allstate does no favor to DHS

recipients by enforcing DHS requirements[.]"

For the reasons discussed *infra* in section III, we hold: (1) that HRS § 431:10C–111 is applicable to all HJUP policies, which take the form of Certificates of Eligibility that have been validated by insurers and returned to the DHS and *not* the no-fault insurance identification cards issued pursuant to HRS § 431:10C–107 (1993); (2) that, other than for the reasons stated in HRS § 431:10C–111, an insurer may not cancel an HJUP insurance policy; (3) that the "temporary no-fault identification card" procedure, apparently approved informally by the HJUP Board, has never been promulgated as a regulation in the HAR; and (4) that the authority to ensure that applicants have registered their vehicles is vested in the insurance commissioner and the DHS. Accordingly, we (1) vacate the circuit court's (a) FOFs and COLs, entered August 29, 2000, and (b) judgment, entered September 26, 2000, and (2) remand this matter to the circuit court for further proceedings consistent with this opinion.

## I. BACKGROUND

The present matter arises out of an MVA in which a vehicle operated by Ponce collided with a motorcycle operated by Silva, causing Silva "serious personal and bodily injuries; including [the] los[s] of his spleen, half of his pancreas and damage[ to] his kidney[.]"

We adopt the following FOF's by the circuit court, which are undisputed except where otherwise noted:

### FINDINGS OF FACT

1. Ponce acquired an interest in a 1985 Toyota vehicle.

2. The certificate of title showing the transfer of the 1985 Toyota to Ponce indicates that Ponce acquired his interest in the vehicle on March 21, 1997.

3. At that time, Ponce was a public assistance recipient. He applied for a motor vehicle insurance policy under [the HJUP].

4. On or about March 31, 1997, an official of the [DHS] signed a Certificate of Eligibility relating to the 1985 Toyota.

5. The Certificate of Eligibility required that an applicant for a policy deliver the "vehicle registration" to a "servicing carrier of the [HJUP]" in order to obtain a policy.

6. Ponce went to Allstate to obtain a policy pursuant to the Certificate of Eligibility.

7. On April 9, 1997, Allstate validated the Certificate of Eligibility and returned it to the DHS.

8. On April 9, 1997, Ponce signed a document provided by Allstate under which Ponce acknowledged that he understood that he must provide to Allstate a current vehicle registration indicating the registration is in his name. The document further stated that if the registration [was] not provided, then the policy would be canceled within 60 days from the date of the document.

9. Ponce was given a no-fault identification card which provided coverage for the period from April 9, 1997 until June 9, 1997.

10. On April 10, 1997, the certificate of eligibility was received by the DHS.

11. On May 6, 1997, Allstate sent a letter to Ponce indicating that his policy would be canceled on June 10, 1997 because of his failure to provide a current vehicle registration in his name.

12. On May 20, 1997, Ponce obtained a Certificate of Registration under which the 1985 Toyota was registered in his name.

13. Ponce did not send a copy of the Certificate of Registration to Allstate.

14. On June 10, 1997, coverage under the policy issued by Allstate to Ponce terminated.

15. On or about June 10, 1997, Allstate sent to the DHS an advisory that it was not able to validate the Certificate of Eligibility because Ponce did not provide a current vehicle registration in his own name.[ 11]

16. On June 19, 1997, the underlying accident occurred in this case.

On October 20, 1997, Silva filed a complaint in the circuit court of the third circuit, Civil No. 97–516, against Ponce alleging, *inter alia*, that Ponce "operated and controlled a motor vehicle negligently, carelessly, without due care, and/or ... was inattentive to his driving, and as a proximate result of said conduct the motor vehicle he was operating collided with the [m]otorcycle operated by [Silva]," causing Silva various damages. Silva prayed for the following relief: (1) general damages; (2) special damages; (3) reasonable attorneys fees, expert witness fees, and costs; (4) interest on damages and losses he suffered from the date of the MVA and/or damage computed at the judgment rate provided by law; and (5) such other and further relief as the circuit court might deem just and proper. By letter dated May 22, 1998, Silva informed Allstate that he had brought suit against its insured (*i.e.*, Ponce), that he had served process on Ponce on April 22, 1998, and that "the twenty days to answer or plead otherwise ha[d] expired." Silva further requested notification "as to Allstate's position in [the] matter[.]"

On October 14, 1998 Allstate filed a complaint for declaratory relief in the present matter seeking

a declaration that neither Ponce nor Silva are entitled to coverage and/or insurance benefit including without limitation a defense and/or indemnity under Ponce's Allstate automobile insurance policy no. 407 086 497 ... with respect to any claims arising out of Ponce's involvement in [an MVA] which occurred on June 19, 1997, including any claims asserted in an action entitled *Alberto A.F. Silva v. Brian E. Ponce, et al.*, Civil No. 97–516, Circuit Court of the Third Circuit of the State of Hawaii[.]

Based on the facts alleged in the complaint, Allstate prayed for the following relief: (1) "a binding declaration by the circuit court that

11. On appeal, as he did before the circuit court, Silva maintains that FOF No. 15 is clearly erroneous.

Allstate has no duty to defend and/or indemnify Ponce under the [HJUP] [p]olicy for any claims arising out of the [MVA], including without limitations any claims asserted in [Civil No. 97–516]"; (2) "a binding declaration that Allstate has no duty to make any payments to any person or entity under the [HJUP] [p]olicy for any accident related injuries or claims"; (3) "a binding declaration that even if Ponce qualified as an 'insured' under the subject [p]olicy at the time of the [MVA], coverage did not apply to the accident since Ponce failed to comply with the notice provisions under the [p]olicy"; and (4) "costs, reasonable attorneys' fees, and such other and further relief as [the circuit] [c]ourt deem[ed] just and equitable."

On August 29, 2000, after a jury-waived trial, the circuit court entered FOFs and COLs, concluding as follows:

### CONCLUSIONS OF LAW

1. Under HRS § 431:10C–407(2)(A)[, see supra note 5], a person is eligible for an HJUP bodily injury policy if he or she is: (1) a licensed driver, (2) receives public assistance benefits, and (3) is the sole registered owner of the motor vehicle to be insured.

2. In this case, there is no dispute that as of May 20, 1997, Ponce would have been eligible for an HJUP bodily injury policy. However, the problem is that Ponce failed to timely submit to Allstate a certificate of registration showing that he was the sole owner of the 1985 Toyota.

3. The procedure for the grant of a policy to a public assistance benefit recipient is: (1) the DHS provides a certificate of eligibility to an eligible licensed driver, (2) the applicant submits the certificate to the servicing carrier of the applicant's choice, (3) the certificate shall be accepted by the servicing carrier and treated as if it were payment in full for the requested no-fault coverage, (4) the servicing carrier certifies the certificate which then functions as a no-fault policy, (5) the servicing carrier issues a no-fault insurance card, and (6) the servicing carrier promptly notifies the director of the DHS. However, the servicing carrier shall develop the information necessary to validate the eligibility of the applicant. [HAR] § 16–23–73(a). [See supra note 6.]

4. The problem with this scheme is that the applicant for a policy may not be able to provide a certificate of registration showing that the car is solely owned by him or her at the time he applies for the policy and, therefore, does not qualify for an HJUP policy. One possible scenario under which this occurs is where a safety check is required as a condition for the issuance of a certificate of registration and a safety check cannot be undertaken because the vehicle is not insured.

5. In order to address this problem, during 1997 the procedure was approved by the HJUP Board of Governors was for the servicing carrier to issue a temporary policy. It was generally understood that the servicing carrier had the obligation to provide a temporary policy which would be effective for at least thirty days. The temporary policy would enable the applicant to obtain a certificate of registration showing that the applicant is the sole registered owner. Once the certificate of registration was obtained and delivered to the servicing carrier, then the policy would be in force for the entire period of the policy. If the certificate of registration were not received, then the policy would terminate.

6. In this case, at the time Ponce applied for the HJUP policy at the DHS, he was not eligible to receive such a policy because he was not the sole registered owner of the vehicle. In order to receive the HJUP policy, Ponce not only had to be eligible to receive such a policy, but also had the obligation to meet the conditions required for the issuance of such a policy.

7. Simply, the HJUP statute is not self-executing. Mere eligibility does not result in a public assistance recipient receiving an HJUP policy. He or she must apply for the policy.

8. Ponce's obligations were two-fold: first, to comply with the DHS requirements for such an application; and, second, to comply with Allstate's requirements for such an application.

9. First, in regard to the DHS requirements, the Certificate of Eligibility made it clear that Ponce had the obligation of delivering a certificate of registration to the servicing carrier, as part of the application process.

10. Second, Allstate made it clear that Ponce had the obligation of delivering to it a certificate of registration showing ownership in his name as part of the application process.

11. These requirements were reasonable in light of the HJUP eligibility requirement that the motor vehicle be solely registered in the applicant's own name.

12. It was also reasonable for Allstate to provide for the issuance of a full-term HJUP policy.

13. These requirements constitute a condition for the issuance of a full-term HJUP policy.

14. Since Ponce failed to fulfill the condition, Allstate properly allowed the temporary policy issued to Ponce to expire and properly reported to the DHS that Allstate could not validate the Certificate of Eligibility.

15. Allstate did not have the obligation to defend or indemnify Ponce for an occurrence which occurred after June 10, 1997 nor any obligation to make payments for any occurrence which occurred after June 10, 1997.

16. The Court will enter judgment in favor of ... Allstate ... and against ... Ponce and ... Silva. A declaratory judgment will be entered as follows: (1) Allstate has no duty to defend or indemnify Ponce regarding the subject [MVA]; and (2) Allstate has no duty to make payments to any person or entity under the subject policy for the subject [MVA].

On September 26, 2000, the circuit court entered judgment as follows:

### JUDGMENT

Trial in this action having gone forth before [the circuit] [c]ourt on June 26, 2000, and the [FOFs] [a]nd [COLs] having been entered herein on August 29, 2000, it is hereby ordered and adjudged as follows:

1. Judgment is entered in favor of [Allstate] and against [Ponce] and [Silva] with respect to all claims alleged in the Complaint for Declaratory Relief filed in this action;

2. This Judgment resolves all claims asserted between ... Allstate and [Ponce and Silva] in this action. There are no remaining claims or parties.

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that pursuant to Rules 54 and 58 of the Hawaii Rules of Civil Procedure [ (HRCP) ], that a final Judgment be entered in favor of ... Allstate ... and against ... Ponce and ... Silva.

On October 25, 2000, Silva prematurely filed his notice of appeal from the circuit court's FOFs, COLs, and judgment because, although he filed the notice after the entry of the October 10, 2000 order taxing costs, the ninety day period for disposing of Allstate's October 3, 2000 motion for attorneys' fees had not yet expired and no order with regard to that motion had yet been filed. Pursuant to Hawai'i Rules of (HRAP) Rule 4(a)(3) (2004),[12] the notice of appeal is treated as filed on January 2, 2001 and is a timely appeal of (1) the August 29, 2000 FOFs and COLs, (2) the September 26, 2000 judgment, and (3) the October 10, 2000 order taxing costs.[13]

12. HRAP Rule 4(a)(3) provides:

> Time to appeal affected by post-judgment motions. If, not later than 10 days after entry of judgment, any party files a motion that seeks to reconsider, vacate, or alter the judgment, or seeks attorney's fees or costs, the time for filing the notice of appeal is extended until 30 days after entry of an order disposing of the motion; provided, that the failure to dispose of any motion by order entered upon the record within 90 days after the date the motion was filed shall constitute a denial of the motion.

> The notice of appeal shall be deemed to appeal disposition of all post-judgment motions that are filed within 10 days after entry of judgment.

> The 90-day period shall be computed as provided in Rule 26.

13. In its answering brief, Allstate contends that this court has no jurisdiction over the present matter, asserting that Silva's notice of appeal is invalid because, according to Hawai'i precedent, a notice of appeal filed during the pendency of

## II. STANDARDS OF REVIEW

### A. Findings Of Fact And Conclusions Of Law

■ ... In this jurisdiction, a trial court's FOF's are subject to the clearly erroneous standard of review. *State v. Hutch*, 75 Haw. 307, 328, 861 P.2d 11, 22 (1993) (citations omitted). "An FOF is clearly erroneous when, despite evidence to support the finding, the appellate court is left with the definite and firm conviction that a mistake has been committed." *Id.* (citations and internal quotation marks omitted); *see also State v. Batson*, 73 Haw. 236, 246, 831 P.2d 924, 930, *reconsideration denied*, 73 Haw. 625, 834 P.2d 1315 (1992)....

" 'A COL is not binding upon an appellate court and is freely reviewable for its correctness.' " *AIG Hawaii Ins. Co. v. Estate of Caraang*, 74 Haw. 620, 628, 851 P.2d 321, 326 (1993) (quoting *Amfac, Inc. [v. Waikiki Beachcomber Inv. Co.]*, 74 Haw. 85,] 119, 839 P.2d [10,] 28 [ (1992) ] ). This court ordinarily reviews COLs under the right/wrong standard. *In re Estate of Holt*, 75 Haw. 224, 232, 857 P.2d 1355, 1359, *reconsideration denied*, 75 Haw. 580, 863 P.2d 989 (1993) (citation omitted). Thus, " '[a] COL that is supported by the trial court's [FOFs] and that reflects an application of the correct rule of law will not be overturned.' " *Estate of Caraang*, 74 Haw. at 628–29, 851 P.2d at 326 (quoting *Amfac, Inc.*, 74 Haw. at 119, 839 P.2d at 29). "However, a COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the court's conclusions are dependent upon the facts and circumstances of each individual case." *Id.* at 629, 851 P.2d at 326 (quoting *Amfac, Inc.*, 74 Haw. at 119, 839 P.2d at 29) (internal quotation marks omitted).

*State v. Furutani*, 76 Hawai'i 172, 179–80, 873 P.2d 51, 58–59 (1994).

### B. Statutory Interpretation

■ "[T]he interpretation of a statute ... is a question of law reviewable *de novo.*" ... *State v. Arceo*, 84 Hawai'i 1, 10, 928 P.2d 843, 852 (1996) (quoting *State v. Camara*, 81 Hawai'i 324, 329, 916 P.2d 1225, 1230 (1996) (citations omitted)). *See also State v. Toyomura*, 80 Hawai'i 8, 18, 904 P.2d 893, 903 (1995); *State v. Higa*, 79 Hawai'i 1, 3, 897 P.2d 928, 930, *reconsideration denied*, 79 Hawai'i 341, 902 P.2d 976 (1995); *State v. Nakata*, 76 Hawai'i 360, 365, 878 P.2d 699, 704, *reconsideration denied*, 76 Hawai'i 453, 879 P.2d 558 (1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995).

*Gray v. Administrative Director of the Court, State of Hawai'i*, 84 Hawai'i 138, 144, 931 P.2d 580, 586 (1997) (some brackets added and some in original). *See also State v. Soto*, 84 Hawai'i 229, 236, 933 P.2d 66, 73 (1997). Further-

certain post-judgment motions is not effective. Nevertheless, the Hawai'i cases cited by Allstate interpret HRAP Rule 4(a)(4) (1985), prior to its amendment on January 1, 2000. The former HRAP Rule 4(a)(4) provided that the filing of certain post-judgment motions "tolled" the time for appeal until entry of the order disposing of the motion and that a notice of appeal filed during the tolling period was invalid. By contrast, the January 1, 2000 amendment of HRAP Rule 4(a) stated that a notice of appeal filed during the pendency of certain post-judgment motions is not invalid. We therefore deem Silva's notice of appeal as timely filed on January 2, 2001.

It is also noteworthy that Allstate argues that Silva's opening brief was not timely filed, inasmuch as (1) HRAP Rule 28(b) (2004) requires the brief to be filed "[w]ithin 40 days after the filing of the record on appeal," (2) the record on appeal was filed on December 26, 2000, and (3) Silva filed the opening brief on February 6, 2001. Allstate acknowledges that the fortieth day following December 26, 2000 was a Sunday (*i.e.*, February 4, 2001) and that HRAP Rule 26(a) (2004) therefore allowed Silva to timely file his opening brief on Monday, February 5, 2001. Nevertheless, Allstate asserts that, even with the extension to February 5, 2001, Silva's February 6, 2001 filing of his opening brief was not timely.

Notwithstanding Allstate's observations, HRAP Rule 25(a) (2004) provides that "briefs and appendices shall be deemed filed on the day of mailing if mailed by First Class Mail or other class of mail that is at least as expeditious, postage prepaid." Insofar as Silva's opening brief was postmarked February 5, 2001, we deem his opening brief as timely filed pursuant to HRAP Rule 25(a).

more, our statutory construction is guided by established rules:

When construing a statute, our foremost obligation is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself. And we must read statutory language in the context of the entire statute and construe it in a manner consistent with its purpose. . . .

*Gray,* 84 Hawai'i at 148, 931 P.2d at 590 (quoting *State v. Toyomura,* 80 Hawai'i 8, 18–19, 904 P.2d 893, 903–04 (1995)) (brackets and ellipsis points in original) (footnote omitted). This court may also consider "[t]he reason and spirit of the law, and the cause which induced the legislature to enact it . . . to discover its true meaning." HRS § 1–15(2) (1993). "Laws *in pari materia,* or upon the same subject matter, shall be construed with reference to each other. What is clear in one statute may be called upon in aid to explain what is doubtful in another." HRS § 1–16 (1993).

*State v. Rauch,* 94 Hawai'i 315, 322–23, 13 P.3d 324, 331–32 (2000) (some citations omitted).

*In re Doe Children: John, Born on January 27, 1987, and Jane, Born on July 31, 1988,* 105 Hawai'i 38, 52–53, 93 P.3d 1145, 1159–60 (2004) (quoting *In re Doe, Born on June 16, 1994,* 101 Hawai'i at 227–28, 65 P.3d at 174–75 (quoting *In re Jane Doe, Born on June 20, 1995,* 95 Hawai'i 183, 190–91, 20 P.3d 616, 623–24 (2001))) (some ellipsis points added and some in original).

## C. *Interpretation of Administrative Regulations*

▆▆▆ The general principles of construction which apply to statutes also apply to administrative rules. As in statutory construction, courts look first at an administrative rule's language. If an administrative rule's language is unambiguous, and its literal application is neither inconsistent with the policies of the statute the rule implements nor produces an absurd or unjust result, courts enforce the rule's plain meaning.

*International Bhd. of Elec. Workers, Local 1357 v. Hawaiian Tel. Co.,* 68 Haw. 316, 323, 713 P.2d 943, 950 (1986) (citations omitted).

*In re Doe Children: John, Born on January 27, 1987, and Jane, Born on July 31, 1988,* 105 Hawai'i at 53, 93 P.3d at 1160 (quoting *In re Wai'ola O Moloka'I, Inc.,* 103 Hawai'i 401, 425, 83 P.3d 664, 688 (2004) (quoting *Lee v. Elbaum,* 77 Hawai'i 446, 457, 887 P.2d 656, 667 (App.1993))).

## III. DISCUSSION

Silva maintains on appeal, *inter alia,* (1) that Allstate violated HRS § 431:10C–111, *see supra* note 1, by cancelling Ponce's HJUP policy and (2) that pursuant to (a) HRS §§ 431:10C–407, *see supra* note 5, and 431:10C–111, (b) HAR §§ 16–23–73, *see supra* note 6, 16–23–77, *see supra* note 7, 17–654–3, *see supra* note 8, and 17–654–5, *see supra* note 9, and (c) the express terms of the " 'Certificate of Eligibility' for Hawaii No–Fault Insurance through the [HJUP] Bureau," *see supra* note 10, only the DHS should be authorized to cancel an HJUP no-fault insurance policy. Allstate responds, *inter alia,* (1) that "Ponce failed to meet an absolute requirement for HJUP insurance for public assistance recipients," (2) that "Allstate properly issued a temporary policy to allow Ponce to comply with HJUP requirements," and (3) that "Allstate acted in accordance with policies promulgated by the HJUP Board." Silva replies, *inter alia,* that, notwithstanding Allstate's contention that it "properly issued a temporary policy," Ponce's policy was not "temporary[.]" Inasmuch as we hold (1) that HRS § 431:10C–111 did apply to Ponce's HJUP insurance policy, (2) that HRS § 431:10C–111 prohibited Allstate from canceling Ponce's policy other than for the reasons stated in the statute, (3) that the "temporary no-fault identification card" procedure, apparently approved informally by the HJUP Board, has never been promulgated as a regulation in the HAR, and (4) that the authority to ensure that applicants have registered their vehicle is vested in the insurance commissioner and the DHS, we need not address the parties' other arguments.

A. *The Provisions Of HRS § 431:10C–111 Were Not Satisfied.*

■ As observed *supra* in note 1, HRS § 431:10C–111 provides in relevant part that *[a]n insurer may not cancel or refuse to renew a no-fault policy ... once issued except when:*

(1) The license of the principal operator to operate the type of motor vehicle is suspended or revoked;

(2) Premium payments for the policy are not made after reasonable demand therefor; or

(3) The nonrenewal or conditional renewal is limited in accordance with section 431:10C–111.5.

(Emphasis added.) As a preliminary matter, no one claims that any of the foregoing three exceptions pertained to Ponce. Mindful that "our foremost obligation [when construing a statute] is to ascertain and give effect to the intention of the legislature, which is to be obtained primarily from the language contained in the statute itself," *In re Doe Children: John, Born on January 27, 1987, and Jane, Born on July 31, 1988,* 105 Hawai'i at 53, 93 P.3d at 1160, we further observe that the plain language of HRS § 431:10C–111 mandates that insurers may cancel no-fault policies *only if* one of three conditions is present. Upon review of the undisputed FOFs entered by the circuit court and the evidence adduced at trial, we hold that the requirements of HRS § 431:10C–111 were not satisfied prior to cancellation of Ponce's HJUP policy. *See infra* section I.

Allstate contends, however, that "[HRS] § 431:10C–111 simply does not apply ... [because] the HJUP requirements had not yet been met [such that] Ponce's coverage was limited to the temporary sixty day period pending a showing by him that he fulfilled the HJUP requirements." The dispositive question, therefore, is whether HRS § 431:10C–111 governs the present matter.

B. *The Authority To Ensure Vehicle Registration Is Vested In The Insurance Commissioner And The DHS.*

■ With regard to the HJUP requirement that Allstate alleges Ponce did not ful-fill, Allstate cites HRS § 431:10C–407, which states that HJUP "provide[s] no-fault benefits and bodily injury and property damage policies for" persons meeting certain criteria, including, *inter alia,* the requirement that such persons be "the sole registered owners of the motor vehicles to be insured[.]" HRS § 431:10C–407(b)(2)(A); *see also* HAR § 16–23–73(a) (requiring applicants to be "the sole registered owners of motor vehicles to be insured under the JUP"); HAR § 17–654–3 (requiring that an "individual ... be the sole registered owner of the vehicle" "in order to receive Hawaii no-fault auto insurance at no cost"). Furthermore, the Certificate of Eligibility incorporates the foregoing statutory and regulatory requirement under the heading, "HOW TO OBTAIN YOUR POLICY," insofar as applicants for the HJUP are instructed to

[m]ail or present [the] Certificate of Eligibility along with a photostatic copy of [the applicant's] ... vehicle registration to any *servicing carrier* of the [HJUP].

(Emphasis added.) Although FOF No. 12 indicates that, "[o]n May 20, 1997, [after he already had been issued a no-fault policy and identification card from Allstate,] Ponce obtained a Certificate of Registration under which the 1985 Toyota was registered in his name[,]" Silva does not dispute FOF No. 13, to wit, that "Ponce did not send a copy of the Certificate of Registration to Allstate."

The statutory and regulatory authority to enforce the registration requirement of HRS § 431:10C–407(b)(2)(A) and HAR § 16–23–73(a) appears to be vested in either the State of Hawai'i insurance commissioner or the DHS. HRS § 431:10C–407(b)(2)(A) expressly provides that *"the [insurance] commissioner, by rules, shall further define and regulate "* the prerequisites for issuance of a HJUP policy. (Emphasis added.) HRS § 431:10C–407(c) further instructs that *"[t]he [insurance] commissioner may further refine the definitions of the classifications provided for in subsection (b)."* (Emphasis added.) In describing a "[s]ervicing carrier's duties[,]" HAR § 16–23–77(5) provides that "[a] servicing carrier shall ... *[a]ccount to the [insurance] commissioner as required, and take such action as the commissioner may prop-*

*erly require."* (Emphasis added.) By its plain language, HAR § 16–23–77 does *not* extend to the cancellation of HJUP policies by servicing carriers for failure to submit a certificate of registration. *See supra* note 7.

Moreover, HRS § 431:10C–407(b)(2) provides that "[a] certificate shall be *issued by the [DHS]* indicating that the person is a bona fide public assistance recipient as defined in subparagraph (A)." (Emphasis added.) Similarly, HAR § 16–23–73(a) vests the determination of eligibility for a HJUP policy in the DHS, inasmuch as the regulation states that *"[t]he [DHS] shall provide a certificate of eligibility for JUP coverage"* for individuals meeting the programs criteria.[14] (Emphasis added.) HAR § 16–23–73(c) also lists several duties of the DHS related to the termination of public assistance benefits and the cancellation of the HJUP policy:

> *Upon termination of public assistance benefits, the DHS shall:*
>
> (1) Notify the recipient upon termination of public assistance benefits and *instruct the recipient that the recipient must immediately notify the servicing carrier of the termination of benefits and obtain timely insurance for the recipient's vehicle;*
>
> (2) *Give written notice to the recipient that the recipient's JUP basic no-fault policy will terminate thirty days from the date of termination of public assistance benefits.* This notice of cancellation shall be considered as proper notification under section 431:10C–112, HRS, and section 16–23–15, providing the recipient with thirty days notice of cancellation; and
>
> (3) *Notify the servicing carrier of the termination of public assistance benefits and the date the termination was effective.*

(Emphases added.) As noted *supra* in note 10, Section C of Certificate of Eligibility states that it is *the DHS* that completes the "NOTICE OF TERMINATION OF BENEFITS/VEHICLE COVERAGE" and notifies

the servicing carrier "when . . . [a] vehicle is no longer approved for no-fault insurance coverage at no cost."

Allstate concedes that "[HAR § ] 16–23–73 indicates that *the DHS is responsible* for issuing the Certificate of Eligibility to eligible licensed drives receiving public assistance provided they are the sole registered owners of the vehicles to be insured." (Emphasis added.) Nevertheless, Allstate maintains that it had the authority to cancel Ponce's policy pursuant to HAR § 16–23–73(a), which provides that "[t]he *servicing carrier* [ (*i.e.,* Allstate) ] shall *certify* th[e][C]ertificate [of Eligibility] . . . [and] develop the information necessary *to validate* the eligibility of the applicant." (Emphases added.) Allstate further asserts that its exercise of authority to cancel Ponce's policy is consonant with the instructions regarding the Certificate of Eligibility, discussed *supra,* which state that

> The servicing carrier *will verify* [the applicant's] eligibility for insurance at not cost and *then validate* [the][C]ertificate [of Eligibility]. *The validated certificate will be mailed back to [the applicant] and serve as [the applicant's] policy.*

(Emphases added.) FOF No. 5 reflected the foregoing instruction: "The Certificate of Eligibility required that an applicant for a policy deliver the 'vehicle registration' to a '*servicing carrier* of the [HJUP]' *in order to obtain a policy."* (Emphases added.)

Although Allstate attempts to bootstrap its "validation power" into a new basis for cancellation outside of the provisions of HRS § 431:10C–111, the plain language of HAR § 16–23–73(a) unambiguously provides that the servicing carrier has the authority *only* to decide whether to *validate* the certificate. HAR § 16–23–73(a) does not imply that servicing carriers have any authority to cancel *after* they have validated the certificate and the certificate has become a no-fault policy. In that connection, the undisputed FOFs reflect that Allstate did not exercise its "validation power" prior to certifying Ponce's Certificate of Eligibility. FOF No. 4 states

---

**14.** HAR § 17–654–5 underscores the responsibility by the DHS regarding the HJUP, inasmuch as it reiterates that the "certificate of eligibility form [is] *issued by the [DHS* and presented] to one of

the insurance companies which is under the [HJUP] servicing carriers to obtain benefits of a Hawaii no-fault auto insurance policy." (Emphasis added.)

that, "[o]n or about March 31, 1997, an official of the [DHS] signed a Certificate of Eligibility relating to [Ponce's] 1985 Toyota[,]" and FOF No. 7 recites that "[o]n April 9, 1997, Allstate validated the Certificate of Eligibility and returned to the DHS."

C. *The Coverage Dates Expressed On The Certificate Of Eligibility Are Controlling.*

◼ Allstate insists, however, that its cancellation was still effective by virtue of the "temporary no-fault card" it issued Ponce. HRS § 431:10C–407(b)(2) provided that *"[t]he [C]ertificate [of Eligibility] shall be deemed a policy for the purposes of chapter 431 upon the issuance of a valid no-fault insurance identification card pursuant to section 431:10C–107."* (Emphasis added.) HRS § 431:10C–107 (1993) [15] provided that "[e]very insurer shall issue to its insureds a no-fault insurance identification card for each motor vehicle for which the basic no-fault coverage is written" and that "[t]he identification card shall contain[, *inter alia*,] ... *[the][e]ffective dates of coverage including the expiration date."* Based on HRS §§ 431:10C–407(b)(2) and 431:10C–107, Allstate argues that "the effective date of coverage should be based on the no-fault card," which became effective on April 9, 1997 and expired on June 9, 1997, rather than "the dates set forth in the Certificate of Eligibility[,]" to wit, March 31, 1997 to March 31, 1998.[16]

As discussed *supra*, HRS § 431:10C–407(b)(2) states that *"[t]he [C]ertificate [of Eligibility] shall be deemed a policy for the purposes of chapter 431* upon the issuance of a valid no-fault insurance identification card pursuant to section 431:10C–107." (Emphasis added.) HAR § 16–23–73(a) further provides that, once "[t]he servicing carrier ... certif[ies] the C]ertificate [of Eligibility,] ... *[it] will function as a no-fault policy* and [the servicing carrier will] issue the applicant a no-fault insurance identification card." (Emphasis added.) Pursuant to HRS § 431:10C–407(b)(2) and HAR § 16–23–73(a), therefore, Ponce's Certificate of Eligibility, with its coverage dates of March 31, 1997 to March 31, 1998, became his no-fault policy when Allstate certified it and issued his no-fault identification card.

Although Ponce's policy was in conflict with his no-fault identification card with regard to the effective dates of coverage, the fact remains that HRS § 431:10C–237 (1993) provides that "[e]very insurance contract shall be construed according to the entirety of its terms and conditions *as set forth in the policy,* and as amplified, extended, restricted, or modified by any rider, endorsement or application *attached to and made a part of the policy."* (Emphases added.) Our construction of an insurance contract is therefore guided by the terms of the policy, *not* the no-fault identification card. Moreover,

[w]e have acknowledged that "[b]ecause insurance policies are contracts of adhesion and are premised on standard forms prepared by the insurer's attorneys, we have long subscribed to the principle that *they must be construed liberally in favor of the insured and [any] ambiguities [must be] resolved against the insurer."* *Sturla, Inc. v. Fireman's Fund Ins. Co.,* 67 Haw. 203, 209, 684 P.2d 960, 964 (1984) (citations and internal quotation marks omitted)....

---

15. Effective January 1, 1998, the legislature amended HRS § 431:10C–107 in respects not germane to the present matter. *See* 1997 Haw. Sess. L. Act 251, § 18 at 526. Effective January 1, 1999, the legislature again amended HRS § 431:10C–107 in respects not pertinent to the present matter. *See* 1998 Haw. Sess. L. Act 207, § 1 at 720. Effective April 19, 2000, the legislature further amended HRS § 431:10C–107 in respects not relevant to the present matter. *See* 2000 Haw. Sess. L. Act 24, § 6 at 41.

16. We acknowledge that, as Allstate notes in its answering brief and the circuit court found in FOF No. 8,

On April 9, 1997, Ponce signed a document provided by Allstate under which Ponce acknowledged that he understood that he must provide to Allstate a current vehicle registration indicating the registration is in his name. The document further stated that if the registration were not provided, then the policy would be canceled within 60 days from the date of the document.

As discussed *infra,* however, in light of the statutory and regulatory scheme, the foregoing document has no impact on our analysis and is not legally binding on our determination as to whether Allstate's cancellation of Ponce's policy was effective.

"Put another way, the rule is that *policies are to be construed in accord with the reasonable expectations of a layperson.*" *Id.* . . .

*Dairy Road Partners v. Island Ins. Co., Ltd.,* 92 Hawaiʻi 398, 411–12, 992 P.2d 93, 106–07 (2000) (quoting *Estate of Doe v. Paul Revere Ins. Group,* 86 Hawaiʻi 262, 271, 948 P.2d 1103, 1112 (1997) (quoting *Dawes v. First Ins. Co. of Hawaiʻi, Ltd.,* 77 Hawaiʻi 117, 121–22, 883 P.2d 38, 42–43, *reconsideration denied,* 77 Hawaiʻi 489, 889 P.2d 66 (1994))) (emphases added) (some brackets and ellipsis points added and some in original) (some internal citations omitted). Based on *Dairy Road Partners,* we resolve the ambiguity of effective coverage dates in favor of Ponce, the insured, insofar as a layperson would reasonably expect the terms of his insurance policy (*i.e.,* the Certificate of Eligibility) to govern his coverage, rather than the no-fault identification card. *Id.* We also note that our analysis is consonant with HAR § 16–23–73(a), which expressly provides that "*effective date of coverage shall be the same date as the signature date on the [C]ertificate [of Eligibility] by the applicant* [.]" (Emphasis added.)

**D.   *The "Temporary No–Fault Identification Card" Procedure Was Not Effective.***

Notwithstanding the foregoing, Allstate maintains that it "acted in accordance with policies promulgated by the HJUP Board" because "the issuance of temporary no-fault cards was an *approved* procedure set forth by the HJUP Board of Governors." (Emphasis in original.) Allstate asserts that "[t]he HJUP Board of Governors is a specifically authorized body under the HJUP statute" and cites HRS § 431:10C–405(a) (1993),[17] which provides in relevant part that

[t]he [insurance] commissioner shall establish within the [joint underwriting plan] bureau, a board of governors for the purpose of providing expertise and consultation on all matters pertaining to the operation of the bureau and the joint underwriting plan.

Because "the Board of Governors is a statutorily created body under the Insurance Commissioner and authorized to address 'operation' of the [HJUP,]" Allstate insists that this court should affirm the circuit · court's judgment based on the trial testimony of the members of the board as to the acceptance of the "temporary no-fault card" procedure and the Board's minutes. Allstate also contends that, if the HJUP Board had not created and approved the "temporary no-fault identification card" procedure, "*Ponce would not have been insured at all in the first place* [,]" inasmuch as the HJUP results in a "Catch–22" for many applicants, as noted by the circuit court in COL No. 4:

4. The problem with [the HJUP] is that the applicant for a policy may not be able to provide a certificate of registration showing that the car is solely owned by him or her at the time he applies for the policy and, therefore, does not qualify for an HJUP policy. One possible scenario under which this occurs is where a safety check is required as a condition for the issuance of a certificate of registration and a safety check cannot be undertaken because the vehicle is not insured.

(Emphasis in original.)

It is noteworthy that the "temporary no-fault identification card" procedure that Allstate urges this court to approve has never been promulgated as a regulation in the HAR. Testimony by a member of the HJUP Board and the Board's minutes cannot substitute for lawfully adopted administrative regulations. Furthermore, as discussed *supra,* the express terms of Ponce's HJUP policy provided him coverage from March 31, 1997 to March 31, 1998, notwithstanding the approval of the "temporary no-fault identification card" procedure by the HJUP Board. Thus, Allstate could not have cancelled Ponce's policy unless it complied with the provisions of HRS § 431:10C–111, and Allstate's failure to do so renders its cancellation invalid.

**17.**   Effective July 1, 2003, the legislature amended HRS § 431:10C–405 in respects not germane

to the present matter. *See* 2003 Haw. Sess. L. Act 212, § 85 at 695–96.

## IV.  *CONCLUSION*

In light of the foregoing analysis, we (1) vacate the circuit court's (a) FOFs and COLs, entered August 29, 2000, and (b) judgment, entered September 26, 2000, and (2) remand this matter to the circuit court for further proceedings consistent with this opinion.